[No. F001894. Fifth Dist. July 11, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
CLYDE WILLIAM PARRISH, Defendant and Appellant.

338

**COUNSEL**

Quin Denvir and Frank O. Bell, Jr., State Public Defenders, under appointment by the Court of Appeal, Mark L. Christiansen, Chief Assistant State Public Defender, and Laurance S. Smith, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Robert D. Marshall, Karen Ziskind and Michael T. Garcia, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BROWN (G. A.), P. J.**—Clyde William Parrish was convicted by a jury of assault by means of force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)) and was found to have inflicted great bodily injury pursuant to Penal Code section 12022.7. He was sentenced to the upper term of four years on the section 245, subdivision (a), conviction, with a three-year enhancement (Pen. Code, § 12022.7).

Appellant makes two contentions: (1) that assault with force likely to produce great bodily injury with a great bodily injury enhancement cannot be punished more severely than battery with great bodily injury and (2) the trial court prejudicially erred in admitting into evidence two prior felony convictions for impeachment purposes. We affirm.

## FACTS

Gerald McKay spent the night of June 20, 1982, at the residence of appellant. Appellant returned to his residence during the early morning hours with some beer, which the two men proceeded to consume. On the morning of June 21, 1982, at approximately 6 a.m., McKay and appellant departed to buy cigarettes. While doing so, they also purchased a small bottle of Thunderbird wine.

McKay remembered walking back through the park near the apartment, but the next thing he remembered was waking up in the hospital. McKay never saw anyone hit him. All the bones in McKay's face were broken.

William Maynard observed two men walking near his residence at about 9 a.m. on June 21. They appeared to be wrestling over a bottle of wine. Appellant struck McKay, and McKay fell down. Appellant proceeded to kick McKay in the ribs and in the head and jumped on his head and chest. Appellant then moved McKay's body about four feet so he was close to a chain link fence. Then, holding onto the fence, appellant proceeded to jump up and down on the victim's face.

Maynard went to call the police, and upon returning he observed that appellant was walking away. Appellant then returned to where McKay lay and began kicking him again in the head and in the chest with extreme force, yelling at him to get up and fight. Appellant was also leaning over McKay, punching him and picking his head up by the hair and slamming it into the ground.

Alton Johnson, aged 10, and his friend observed an altercation between two men in the park the same morning. Johnson did not remember what the men looked like and could not identify appellant.

An officer responded to Maynard's call and arrived at the scene. He observed an unconscious man on the ground who was bleeding profusely. Appellant had walked off. He was cut off by the police and was arrested not far from the scene. Appellant had blood on his hands, shirt, pants, and boots.

In response to the officer's asking for his name, appellant replied, "'I really smoked the son of a bitch didn't I.'" While being transported to jail, appellant said, "'I really fucked him up again. Is he going to die? I hope the fucker dies.'" One of the officers who was taking pictures at the scene testified that appellant voluntarily stated, "Yeah, I did it and he deserved it," that he enjoyed "fucking people up," and again said he wished he had "killed the bastard."

McKay spent 25 days in the hospital. All the bones in his face were broken and had to be wired together. His jaws were wired shut for eight months, his vision was blurry, he had headaches and he suffered a loss of memory at the time of trial.

Appellant did not take the witness stand and offered no defense.

DISCUSSION

PART I

Appellant argues that assault by means of force likely to produce great bodily injury with a great bodily injury enhancement cannot be punished more severely than battery with great bodily injury.[1]

Appellant's contentions are without merit because underlying each assertion is the incorrect premise that Penal Code section 245, subdivision (a), merely punishes an attempt to commit an aggravated battery.

*Double Punishment*

Assault is an attempted battery. (*People* v. *Heise* (1933) 217 Cal. 671, 673 [20 P.2d 317]; *People* v. *Fuller* (1975) 53 Cal.App.3d 417, 421 [125 Cal.Rptr. 837].) Appellant argues that Penal Code section 245, subdivision (a), punishes an attempted aggravated battery and that Penal Code section 12022.7 punishes a completed aggravated battery. Appellant thus contends that incarceration under both sections, for an attempt and the completed act, constitutes prohibited dual punishment.

However, the state is not barred from imposing punishment for an attempt merely because the crime has been completed. (*People* v. *Johnson*

---

[1] Penal Code section 243, subdivision (d), provides: "When a battery is committed against any person and serious bodily injury is inflicted on the person, the battery is punishable by imprisonment in the county jail for a period of not more than one year or imprisonment in the state prison for two, three, or four years."

(1971) 21 Cal.App.3d 235, 247 [98 Cal.Rptr. 393].) Penal Code section 663 provides in pertinent part: "Any person may be convicted of an attempt to commit a crime, although it appears on the trial that the crime intended or attempted was perpetrated by such person in pursuance of such attempt, . . . ."

Appellant's argument is incorrect because Penal Code section 245, subdivision (a), defines a crime which is separate and distinct from the battery crimes contained in Penal Code section 243. (*People* v. *Fuller, supra,* 53 Cal.App.3d 417, 422.)

Punishment under section 245, subdivision (a), is directed at the force used, and it is immaterial whether the force actually results in any injury. The focus is on force likely to produce great bodily injury. (*People* v. *Wingo* (1975) 14 Cal.3d 169, 176 [121 Cal.Rptr. 97, 534 P.2d 1001].)

Infliction of great bodily injury is not an element of assault by means likely to produce great bodily injury. The penalty for assault does not contemplate punishment for the infliction of great bodily injury. (*People* v. *Smith* (1981) 122 Cal.App.3d 581, 587 [176 Cal.Rptr. 73].) Where assault by means of force likely to produce great bodily injury has occurred, the assault itself represents a completed crime due to the use of the force. (*People* v. *Yeats* (1977) 66 Cal.App.3d 874, 878 [136 Cal.Rptr. 243]; *People* v. *Smith, supra,* 122 Cal.App.3d 581, 587.)

Thus, when one is convicted under Penal Code section 245, subdivision (a), he may also be convicted of battery. (*People* v. *Fuller, supra,* 53 Cal.App.3d 417, 422; *People* v. *Smith, supra,* 122 Cal.App.3d 581, 587, fn. 2.)

Enhancement under Penal Code section 12022.7 punishes the actual infliction of great bodily injury. The focus is on the result of one's assaultive behavior. Moreover, punishment under section 12022.7 requires the infliction of great bodily injury to be intentional, an element not required for a conviction under assault by means likely to produce great bodily injury or battery with great bodily injury.

The double jeopardy clause of the Fifth Amendment forbids either multiple prosecutions or multiple punishment for the "same offense." (*North Carolina* v. *Pearce* (1969) 395 U.S. 711, 717 [23 L.Ed.2d 656, 665, 89 S.Ct. 2072].) To determine whether one is being punished twice for the "same offense," one looks to the two statutory provisions to see if each provision requires proof of a fact which the other does not. (*Blockburger* v. *United States* (1932) 284 U.S. 299, 304 [76 L.Ed. 306, 309, 52 S.Ct.

180].) Penal Code section 12022.7 requires proof of intent, while Penal Code section 245, subdivision (a), does not. Penal Code section 245, subdivision (a), requires proof of force likely to produce great bodily injury, while Penal Code section 12022.7 does not.

 Moreover, the rule expressed in *Blockburger* is one of statutory construction and not of constitutional law. (*Albernaz* v. *United States* (1981) 450 U.S. 333, 340 [67 L.Ed.2d 275, 282, 101 S.Ct. 1137].) Where it is clear that the Legislature has intended for punishment of a violation of two statutes to be cumulative, regardless of whether these two statutes proscribe the same conduct, cumulative punishment may be imposed under the statutes in a single trial without offending the due process clause. (*Missouri* v. *Hunter* (1983) 459 U.S. 359, 368 [74 L.Ed.2d 535, 543, 103 S.Ct. 673].)

 Penal Code section 12022.7 is not a substantive offense by itself. Rather, it is a legislative attempt to punish more severely those crimes which actually result in great bodily injury. (*People* v. *Superior Court (Grilli)* (1978) 84 Cal.App.3d 506, 512-513 [148 Cal.Rptr. 740] (disapproved on other grounds in *People* v. *Superior Court (Mendella)* (1983) 33 Cal.3d 754 [191 Cal.Rptr. 1, 661 P.2d 1081]).) Penal Code section 12022.7 applies to all offenses except those where serious bodily injury is already an element of the substantive offense charged. As noted above, a violation of Penal Code section 245, subdivision (a), does not require the showing of any actual injury. Thus, punishment under Penal Code section 245, subdivision (a), with an enhancement under Penal Code section 12022.7 is not double punishment for the same offense in violation of Penal Code section 654.[2] As noted above, Penal Code section 12022.7 does not define a separate offense but merely imposes additional punishment. (*People* v. *Superior Court (Grilli)*, *supra*, 84 Cal.App.3d 506, 513.) Penal Code section 654 generally does not apply to enhancements because they do not define a crime or offense but relate only to the penalty imposed under certain circumstances. (*People* v. *Stiltner* (1982) 132 Cal.App.3d 216, 229 [191 Cal.Rptr. 1, 661 P.2d 1081]; *People* v. *Boerner* (1981) 120 Cal.App.3d 506, 511 [174 Cal.Rptr. 629].)

*Equal Protection*

 Appellant next contends that punishment under Penal Code sections 245, subdivision (a)/12022.7 for a longer period of time than is allowable

---

[2]Penal Code section 654 provides: "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one; an acquittal or conviction and sentence under either one bars a prosecution for the same act or omission under any other."

under Penal Code section 243, subdivision (d), violates equal protection because Penal Code sections 243, subdivision (d), and 245, subdivision (a) are functionally equivalent. However, as the preceding section makes clear, the two statutes do not constitute punishment for the same offense and differ in their essential purpose. Section 245, subdivision (a), punishes conduct where extreme force is used, while section 243 punishes the consequences. The fact that actual injury does occur in the course of an assault by means of force likely to produce serious injury, and thus may also be punished under Penal Code section 12022.7, does not alter the basic difference between sections 243 and 245, subdivision (a). (*People* v. *Bertoldo* (1978) 77 Cal.App.3d 627, 633-634 [143 Cal.Rptr. 675].)

Thus, while a violation of Penal Code section 245, subdivision (a), and battery both include elements of simple assault, a violation of Penal Code section 245, subdivision (a), is a greater offense than and separate and distinct from either simple assault or battery. (*People* v. *Fuller, supra,* 53 Cal.App.3d 417, 422.) ■ "The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner." (*In re Eric J.* (1979) 25 Cal.3d 522, 530 [159 Cal.Rptr. 317, 601 P.2d 549].)

■ Because Penal Code sections 245, subdivision (a), and 243, subdivision (d), do not proscribe conduct which is functionally equivalent, persons charged with violations of these statutes are not similarly situated. Thus, appellant's equal protection challenge must fail.

*Special Statute*

■ Appellant next contends that Penal Code section 243, subdivision (d), is the functional equivalent of section 245, subdivision (a), in combination with section 12022.7 because they have a complete identity of elements and, as such, section 243, subdivision (d), is a special statute which supplants sections 245, subdivision (a)/12022.7. This argument was answered in this court's case of *People* v. *Bertoldo, supra,* 77 Cal.App.3d 627, 633: " 'Prosecution under a general statute is precluded by a special statute when the general statute covers the same matter as, and thus conflicts with, the special statute. (*People* v. *Gilbert* (1969) 1 Cal.3d 475, 479 [82 Cal.Rptr. 724, 462 P.2d 580]; *In re Williamson* (1954) 43 Cal.2d 651, 654 [276 P.2d 593].) . . .' "

■ In *Bertoldo,* this court went on to hold that Penal Code section 243 was not a special statute supplanting Penal Code section 245, subdivision (a). "Neither statute meets the 'special' statute requirements of the *William-*

*son-Gilbert* doctrine. Depending upon the type of injury or the force involved or the type of weapon, if any, used, and the acts involved, either one of the two statutes is the more specific. We are unable definitely to denominate either as the more specific so as to supplant the other. Therefore, the doctrine is inapplicable [citation]." (*Id.*, at p. 633.)

### Statutory Construction

In 1978 the Legislature expressly deleted Penal Code section 245, subdivision (a) from the list of offenses which could not be enhanced for great bodily injury under Penal Code section 12022.7. Penal Code section 12022.7 was then reenacted by Statutes 1978, chapter 579. Appellant contends that this amendment to section 12022.7 amends or repeals by implication Penal Code section 654 as applied to violations of Penal Code section 245. ■■■ Repeals and amendments of statutes by implication and reference are forbidden under California Constitution, article IV, section 9.[3]

There is little logic to this contention. Penal Code section 654 is a general statute. It makes absolutely no mention of Penal Code section 12022.7 or which crimes might be enhanced thereunder. It remains as applicable now as it was prior to the 1978 amendment to section 12022.7.

### PART II

### Use of Prior Felonies for Impeachment

Outside the presence of the jury appellant moved the court to exclude the use of two prior felony convictions to impeach him should he take the stand. The convictions were a 1970 forgery conviction and a 1980 voluntary manslaughter conviction.[4] The trial court held that it had no discretion to exclude the priors for impeachment due to the provisions of Proposition 8 (Cal. Const., art. I, § 28, subd. (f), added by initiative measure eff. June 1982 (hereinafter Proposition 8))[5] and ruled it would admit both priors for

---

[3]Article IV, section 9, of the California Constitution provides: "A statute shall embrace but one subject, which shall be expressed in its title. If a statute embraces a subject not expressed in its title, only the part not expressed is void. A statute may not be amended by reference to its title. A section of a statute may not be amended unless the section is reenacted as amended."

[4]The probation officer's report shows that the prior conviction was for voluntary manslaughter.

[5]California Constitution article I, section 28, subdivision (f) provides in pertinent part: "Any prior felony conviction of any person in any criminal proceeding, whether adult or juvenile, shall subsequently be used without limitation for purposes of impeachment or enhancement of sentence in any criminal proceeding."

impeachment should appellant testify. Appellant did not take the witness stand.

Recently, the Supreme Court in *People* v. *Castro* (1985) 38 Cal.3d 301 [211 Cal.Rptr. 719, 696 P.2d 111] interpreted the above referred to provision of Proposition 8 and held: "We shall hold that—always subject to the trial court's discretion under [Evidence Code] section 352—subdivision (f) [of Proposition 8] authorizes the use of any felony conviction which necessarily involves moral turpitude, even if the immoral trait is one other than dishonesty. On the other hand, subdivision (d), as well as due process, forbids the use of convictions of felonies which do not necessarily involve moral turpitude." (*Id.,* at p. 306.)

The *Castro* court further explained the rationale of this conclusion: "While the case in which Justice Holmes explained the rational basis for felony impeachment did involve a prior conviction of a crime which implied dishonesty—'falsely personating' a United States revenue officer—Holmes' reasoning does not depend on dishonesty being an element of the felony. Obviously it is easier to infer that a witness is lying if the felony of which he has been convicted involves dishonesty as a necessary element than when it merely indicates a 'bad character' and 'general readiness to do evil.' Nevertheless, it is undeniable that a witness' moral depravity of any kind has some 'tendency in reason' (Evid. Code, § 210) to shake one's confidence in his honesty. . . .

"There is then some basis—however tenuous—for inferring that a person who has committed a crime which involves moral turpitude other than dishonesty is more likely to be dishonest than a witness about whom no such thing is known. Certainly the inference is not so irrational that it is beyond the power of the People to decree that in a proper case the jury must be permitted to draw it, if it wishes, and the 'no limitation' language of subdivision (f) makes it abundantly clear that the People so decreed." (*People* v. *Castro, supra,* 38 Cal.3d at p. 315; fns. omitted.)

Thus, the threshold question is whether the prior felony necessarily involves moral turpitude. If the felony does involve moral turpitude, the application of Evidence Code section 352 requires the trial court to exercise its discretion in admitting or excluding the prior. The exercise of discretion under section 352 requires the trial court to determine probative value, appraise prejudicial effect and weigh one against the other. (*People* v. *Green* (1980) 27 Cal.3d 1, 25 [164 Cal.Rptr. 1, 609 P.2d 468].) In determining whether otherwise admissible evidence should be excluded, the trial court on the record must determine if its probative value is substantially out-

weighed by the probability that the admission will create substantial danger of undue prejudice.

It is important to note in this regard that the *Castro* case expressly recognizes that Proposition 8 precludes the application of black letter rules of exclusion formerly used. The court states: "The intention of the drafters of the initiative [Proposition 8] was to restore trial court discretion as visualized by the Evidence Code and to reject the rigid, black letter rules of exclusion which we had grafted onto the code by the *Antick* [*People* v. *Antick* (1975) 15 Cal.3d 79] line of decisions." (*People* v. *Castro, supra,* 38 Cal.3d at p. 312.)

In addition to *People* v. *Antick* (1975) 15 Cal.3d 79 [123 Cal.Rptr. 475, 539 P.2d 43], *Castro* expressly refers to *People* v. *Rist* (1976) 16 Cal.3d 211, 218-223 [127 Cal.Rptr. 457, 545 P.2d 833], *People* v. *Rollo* (1977) 20 Cal.3d 109 [141 Cal.Rptr. 177, 569 P.2d 771], *People* v. *Woodard* (1979) 23 Cal.3d 329 [152 Cal.Rptr. 536, 590 P.2d 391], *People* v. *Fries* (1979) 24 Cal.3d 222 [155 Cal.Rptr. 194, 594 P.2d 19], *People* v. *Spearman* (1979) 25 Cal.3d 107 [157 Cal.Rptr. 883, 599 P.2d 74], and *People* v. *Barrick* (1982) 33 Cal.3d 115 [187 Cal.Rptr. 716, 654 P.2d 1243] as expressing principles included within the black letter rules "delineating the boundaries of permissible discretion." (*People* v. *Castro, supra,* 38 Cal.3d at pp. 307-308.)

The *Castro* court equated moral turpitude with a "readiness to do evil." The court stated that a crime involves moral turpitude if it "evince[s] any character trait which can reasonably be characterized as 'immoral.'" (*People* v. *Castro, supra,* 38 Cal.3d at p. 317, fn. 13.) Although the court failed to provide a specific definition of which crimes involve moral turpitude, it stated that some of the definitional problems may be ameliorated by resorting to other bodies of law concerning the characterization of felonies as involving moral turpitude. (*Id.,* at p. 316, fn. 11.) The court referred to 1 Witkin, California Procedure (2d ed. 1970) Attorneys, section 195, and Annotation (1975) 23 A.L.R.Fed. 480, which deals with crimes involving moral turpitude within the meaning of the federal alien deportation statutes. (*People* v. *Castro, supra,* 38 Cal.3d at p. 316, fn. 11.)

Annotation (1975) 23 A.L.R.Fed. 480, to which the *Castro* court referred as a source for determining if a particular offense involves moral turpitude, discusses offenses which involve moral turpitude for the purposes of deporting or excluding an alien under sections 212(a)(9) and 241(a)(4) of the

Immigration and Nationality Act (8 U.S.C. §§ 1182(a)(9), 1251(a)(4).)[6] That annotation states the most commonly adopted definition of moral turpitude as follows: " '[A]n act of baseness, vileness, or depravity in the private and social duties which a man owes to his fellow men or to society in general, contrary to the accepted and customary rule of right and duty between man and man.' " (Annot. (1975) 23 A.L.R. Fed. 480, 492.)[7] Moral turpitude depends upon the state of public morals and may vary according to the community and the times. (*In re Higbie, supra,* 6 Cal.3d 562, 570.) The term is defined by public morals and the common sense of the community. (*In re Hatch* (1937) 10 Cal.2d 147, 151 [73 P.2d 885].)[8]

Clearly, forgery involves elements that go to honesty and truthfulness. In our view, all priors which necessarily involve dishonesty under the pre-*Castro* standards ipso facto involve moral turpitude under *Castro*. (*People* v. *Castro, supra,* 38 Cal.3d at pp. 315-316.) We construe *Castro* by necessary implication to so hold. The issue the trial court should have resolved was whether the forgery conviction should have been excluded under Evidence Code section 352 because of its age. (*People* v. *Antick, supra,* 15 Cal.3d 79.) ■ In applying Evidence Code section 352, it must be kept in mind that *Castro* limits the precedential effect of *Antick* by concluding "The intention of the drafters of the initiative was to restore trial court discretion as visualized by the Evidence Code and to reject the rigid, black letter rules of exclusion which we had grafted onto the code by the *Antick* line of decisions." (*People* v. *Castro, supra,* 38 Cal.3d at p. 312.)

■ We also conclude that voluntary manslaughter involves moral turpitude (an intention to do evil) within the meaning of the above definitions.[9]

[6]These sections provide, respectively, that aliens who have been convicted of a crime involving moral turpitude shall be excluded from admission to the United States and that an alien convicted for a crime involving moral turpitude within five years after entry or who after entry is convicted of two crimes involving moral turpitude shall be deported.

[7]This test was originally set forth in Bouvier's Law Dictionary. The court in *Castro, supra,* 38 Cal.3d at page 316, footnote 11, also cited *Drazen* v. *New Haven Taxicab Co.* (1920) 95 Conn. 500 [111 A. 861] in formulating the moral turpitude standard. The *Drazen* court adopted the Bouvier test for determining moral turpitude. Some California courts have used this standard for disbarment purposes. (See *In re Craig* (1938) 12 Cal.2d 93, 97 [82 P.2d 442]; *In re Higbie* (1972) 6 Cal.3d 562, 569 [99 Cal.Rptr. 865, 493 P.2d 97].)

[8]The term moral turpitude, however, has been defined in various ways. Some courts find that an act of moral turpitude is conduct which is "intrinsically wrong." (See *Guerrero de Nodahl* v. *Immigration & Naturalization Serv.* (9th Cir. 1969) 407 F.2d 1405; *Williams* v. *State* (1975) 55 Ala.App. 436 [316 So.2d 362, 363].) For purposes of disbarment, California courts have stated that moral turpitude consists of " '. . . conduct which is contrary to justice, honesty, and good morals.' " (*Arden* v. *State Bar* (1959) 52 Cal.2d 310, 321 [341 P.2d 6] (quoting from *Fall* v. *State Bar* (1944) 25 Cal.2d 149, 160 [153 P.2d 1]); *Matter of Coffey* (1899) 123 Cal. 522, 524 [56 P. 448].)

[9]Our discussion is limited to voluntary manslaughter. It does not apply to involuntary manslaughter. Most of appellant's discourse in support of his position that manslaughter does not necessarily involve moral turpitude applies to involuntary manslaughter, not to voluntary manslaughter.

In arriving at this conclusion we follow *Castro*'s prohibition against going behind a conviction to examine the underlying facts for the purpose of making the determination of whether voluntary manslaughter involves moral turpitude. The *Castro* court requires that a "prior conviction should only be admissible for impeachment if the least adjudicated elements of the conviction necessarily involve moral turpitude." (*Id.*, at p. 317.)

Manslaughter is "the unlawful killing of a human being without malice." (Pen. Code, § 192.) Voluntary manslaughter always involves an intentional killing, thus an intent to do harm to another. (*People* v. *Germany* (1974) 42 Cal.App.3d 414, 418-419 [116 Cal.Rptr. 841].) The intent to do evil is inherent in the intent to take a human life.

*Castro* suggests reference to two bodies of law to assist in the characterization of felonies as involving or not involving moral turpitude. (*Id.*, at p. 316, fn. 11.) One reference is to the law dealing with the exclusion or deportation of aliens convicted of crimes which is surveyed in Annotation (1975) 23 A.L.R.Fed. 480. The other analogy deals with attorneys' disciplinary proceedings.

The naturalization and deportation cases invariably hold that, without going behind the face of the record, voluntary manslaughter does involve moral turpitude. (See Annot., *supra*, 23 A.L.R.Fed. 480, 522-524.) The principle is succinctly summarized at page 522: "Voluntary manslaughter, committed in a jurisdiction following the common-law classification of manslaughter into voluntary and involuntary, has generally been held to involve moral turpitude, criminal intent being inferred from the voluntary aspect of the crime.

"Thus, conviction in Italy of the crime of voluntary homicide 'with grave provocation,' although the 3-year sentence imposed was reduced because of extenuating circumstances, was held by the court in *De Lucia* v. *Flagg* (1961, CA7 Ill) 297 F.2d 58, cert. den. 369 U.S. 837, 7 L.Ed. 2d 843, 82 S.Ct. 867, to be conviction of a crime involving moral turpitude, the court stating that the term 'voluntary' indicated an intent to kill, and the fact that a sentence was imposed negated any possibility that the killing was justifiable. So long as a homicide is voluntary and not justifiable, said the court, no amount of provocation can remove it from the class of crimes involving moral turpitude."

On the other hand, in State Bar of California disciplinary proceedings the determination of whether voluntary manslaughter involves moral turpitude

is resolved after an examination of the underlying facts and circumstances of the crime (*In re Strick* (1983) 34 Cal.3d 891, 898 [196 Cal.Rptr. 509, 671 P.2d 1251]), keeping in mind that the purpose of State Bar proceedings is not to criminally punish the lawyer but to afford protection to the public and to the profession by conducting an investigation into the moral fitness of the lawyer to practice law. (*In re Rothrock* (1940) 16 Cal.2d 449, 454 [106 P.2d 907, 131 A.L.R. 226].)

Because the two sources of existing authority referred to by *Castro* convey conflicting messages, these analogies are useful only to a point. We must resolve the issue for ourselves in the context of the present proceedings.

In the case at bench, like the deportation cases, we are bound to only examine the face of the conviction. Unlike the State Bar disciplinary proceedings, we are looking at voluntary manslaughter only as it bears upon the concept of the readiness to do evil and as a result thereof the " 'tendency in reason' (Evid. Code, § 210) to shake one's confidence in [a witness'] honesty." (*People v. Castro, supra,* 38 Cal.3d at p. 315.) In this context, we are persuaded that the intentional taking of a human life, whatever the excuse for doing so, involves the intent to do harm to another. The intent to do evil is always involved in the intentional taking of a human life. Accordingly, we conclude that voluntary manslaughter necessarily involves moral turpitude within the meaning of that term as used in *Castro.*

 In the case at hand, though both priors involved moral turpitude and thus were prima facie admissible, the trial court's failure to exercise its discretion on the record in ruling upon the admissibility of the priors was clear error. In *Castro* the trial court, relying upon a facial reading of Proposition 8, assumed it had no discretion and admitted a prior conviction of simple possession of heroin and a prior conviction of possession for sale of heroin. *Castro* held the trial court erred in admitting the prior possession conviction because that offense does not involve moral turpitude. It also held that possession for sale of heroin does involve moral turpitude but the court erred in not exercising its discretion under Evidence Code section 352 in ruling the prior conviction was admissible. Nevertheless, upon an examination of the facts supporting the conviction, the court concluded in *Castro* that the error was nonprejudicial under the test set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].

Our task in the instant case therefore is to determine if the court's error in failing to exercise its discretion was prejudicial.

The direct evidence of guilt in this case was virtually insurmountable. There were two eyewitnesses who testified. William Maynard testified that

appellant struck the victim and he fell down. Appellant proceeded to kick the victim in the ribs and head and jumped on the victim's head and chest. All that time the victim was lying motionless on the ground. Appellant then moved the victim's body about four feet so he was close to a chain link fence. Holding onto the fence, appellant proceeded to jump up and down on the victim's face. After walking away, appellant returned to where the victim lay and began kicking him again in the head and in the chest with extreme force, yelling at him to get up and fight, that he took his wine. Also, he picked appellant's head up by the hair and slammed it into the ground.

Witness Maynard called the police. On cross-examination no progress was made in shaking his credibility as a witness.

When arrested while walking away a short distance from the scene, appellant had fresh blood on his hands, shirt, pants and boots. He made several damaging admissions to the officer. The viciousness of the crime, combined with appellant's statements to the officer, leaves no doubt about his intent to inflict great bodily injury.

One wonders what his defense could possibly have been. ▮▮▮ Certainly self-defense has no place in this scheme of things wherein appellant repeatedly hit, kicked, stomped and beat the victim while he lay motionless on the ground. In this regard, assuming that the initial encounter may have conceivably given appellant the right to exercise self-defense, that defense in nowise justified the recurrent attacks upon the victim while he lay on the ground helpless and unconscious. As CALJIC No. 5.52, fourth edition 1979, instructs: "The right of self-defense exists only as long as the real or apparent threatened danger continues to exist. When such danger ceases to appear to exist, the right to use force in self-defense ends."

▮▮▮ We are aware of the doctrine developed by the progeny of *People v. Beagle* (1972) 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1] which hold in substance that if the defendant stayed off the stand as the result of a threat of impeachment by prior felonies and the felonies were not in fact admissible then reversal usually followed. As the Supreme Court stated in *People v. Barrick, supra,* 33 Cal.3d 115, 130: "The record reveals that following the ruling on the *Beagle* motion, the attorney for the defendant advised him not to testify. The court has no way of knowing what defendant's testimony would have been, thus, we have no basis for concluding that such testimony would not have affected the result. ' "[E]rrors at a trial that deprive a litigant of the opportunity to present his version of the case . . . are . . . ordinarily reversible, since there is no way of evaluating whether or not they affected

the judgment." (Traynor, [The Riddle of Harmless Error (1970)] at p. 68.) . . .' "[10] "Ordinarily" does not mean "always." Our research has turned up no case wherein the Supreme Court has held that the error is reversible per se. The rule by its terms indicates that the failure of the defendant to take the stand does not always result in reversal.

█ The Supreme Court stated in *People* v. *Rist, supra,* 16 Cal.3d 211, 222: "Perhaps the most difficult to evaluate of the *Beagle* factors is the adverse effect on the administration of justice should a defendant elect not to testify for fear of impeachment. *Such an evaluation must necessarily depend in large part on the totality of other evidence bearing on the question of the defendant's guilt in the unique circumstances of the particular case.* The trial court may be aided in making such evaluation should the defendant in support of his motion to exclude prior convictions make an offer of proof as to matters to which he will testify should the motion be granted." (Italics added.) While the court in *Rist* was dealing with the admissibility of the prior conviction, not the prejudicial effect of erroneously admitting a prior conviction, the germane philosophy expressed has meaning in the present context.

At least one case has found "*Beagle* error" harmless and thus upheld a conviction where the defendant stayed off the stand because of the threat of impeachment by an inadmissible prior felony. (See *People* v. *Fisher* (1984) 153 Cal.App.3d 826 [200 Cal.Rptr. 683].)

█ Upon review of the entire record, we conclude it is not reasonably probable that a result more favorable to appellant would have occurred in the absence of the error. (*People* v. *Castro, supra,* 38 Cal.3d at p. 319, citing *People* v. *Watson, supra,* 46 Cal.2d at p. 836.)

---

[10]Interestingly, the Supreme Court of the United States arrived at an opposite conclusion. The syllabus to *Luce* v. *United States* (1984) 469 U.S. 38, — [83 L.Ed.2d 443, 445-446, 105 S.Ct. 460, 461-462] accurately summarizes the court's holding as follows: "*Held:* To raise and preserve for review the claim of improper impeachment with a prior conviction, a defendant must testify. To perform the weighing of the prior conviction's probative value against its prejudicial effect, as required by Rule 609(a)(1), the reviewing court must know the precise nature of the defendant's testimony, which is unknowable when, as here, the defendant does not testify. Any possible harm flowing from a district court's *in limine* ruling permitting impeachment by a prior conviction is wholly speculative. On the record in this case, it is conjectural whether the District Court would have allowed the Government to impeach with the prior conviction. Moreover, when the defendant does not testify, the reviewing court has no way of knowing whether the Government would have sought so to impeach, and cannot assume that the trial court's adverse ruling motivated the defendant's decision not to testify. Even if these difficulties could be surmounted, the reviewing court would still face the question of harmless error. . . . Requiring a defendant to testify in order to preserve Rule 609(a) claims enables the reviewing court to determine the impact any erroneous impeachment may have in light of the record as a whole, and tends to discourage making motions to exclude impeachment evidence solely to 'plant' reversible error in the event of conviction."

The judgment is affirmed.

Franson, J., and Hamlin, J., concurred.

A petition for a rehearing was denied July 31, 1985, and appellant's petition for review by the Supreme Court was denied November 14, 1985.