[No. F022099. Fifth Dist. Oct. 31, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
KATHLEEN O'CONNELL, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts I., II. and IV.

## Counsel

Katherine Hart, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Edgar A. Kerry and Margaret Venturi, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

ARDAIZ, P. J.—By information filed in Stanislaus County Superior Court on January 13, 1994, appellant, Kathleen O'Connell, was charged with the attempted premeditated murder of her two minor children in violation of

Penal Code sections 664/187 and two related counts of felony child endangerment in violation of Penal Code section 273a, subdivision (1).[1] Each count also contained an allegation that appellant had inflicted great bodily injury upon the child named in the particular count in violation of section 12022.7. On January 13, 1994, appellant was arraigned, entered pleas of not guilty to all charges, and denied each of the accompanying enhancements.

Appellant subsequently brought a section 995 motion in superior court seeking to have the section 12022.7 enhancements stricken, claiming she did not intend to inflict the actual injury sustained by her two daughters (i.e., severe burns). Appellant also asked the court to strike the premeditation enhancement based on a claim of insufficient evidence to support it. The court took the matter under submission and, a few days later, denied both requests.

Jury trial commenced on May 9, 1994. At the close of the People's case, defense counsel renewed his motion to strike the section 12022.7 enhancements, relying on the same rationale that he employed in the section 995 motion. The People objected since the issue had already been resolved adversely to appellant. Defense counsel interjected that he did not feel bound by the earlier determination when presenting the section 1118 motion.

In addressing the merits of the motion, the People conceded that appellant did not intend to catch the house on fire but argued that she nevertheless intended for the children to die, which the People noted was the ultimate form of great bodily injury. The People also conceded the statute was susceptible to interpretation but insisted that it should not be read to require the specific intent to inflict the particular injury sustained, but rather the specific intent to inflict great bodily injury.

The trial court expressed its belief that defense counsel was confusing the specific intent to commit great bodily injury with the specific intent to cause a particular injury. The court found the latter intent irrelevant under section 12022.7 and denied the motion.

After two days of trial, the jury found appellant guilty as charged. Appellant subsequently brought a motion for new trial based on the identical section 12022.7 enhancement issue. The motion was heard and denied on June 30, 1994. Imposition of judgment immediately followed.

The court began by indicating that it had read and considered a report prepared by Philip S. Trompetter, Ph.D., a clinical psychologist, and submitted by defense counsel. The court denied appellant probation and, on count

---

[1]All subsequent statutory references are to the Penal Code unless otherwise indicated.

1, sentenced her to life with the possibility of parole, plus three years on the great bodily injury enhancement. On count 2, appellant was ordered to serve a concurrent life term with the possibility of parole. The sentence on counts 3 and 4 was ordered stayed pursuant to section 654.

Notice of appeal was timely filed on August 5, 1994.

## FACTS

On February 4, 1993, Dave Bailey (Bailey), arrived home from work at approximately 4:20 p.m.. A short time later, he heard a loud explosion. From his front door, Bailey could see his neighbor's house in flames. He immediately hopped the fence that divided the two properties and looked inside the blown out dining room window. From there, he could see two children lying on the living room floor.

Bailey retrieved the children one at a time. Flames in the hallway prevented him from checking the other rooms. He began yelling for appellant and her husband Kenny as he did not know who else was in the house. Getting no response, and unwilling to risk his life, he grabbed a hose and started to spray the house.

Beverly McWilliams said she was standing outside a few residences away and watched as the house exploded. She telephoned 911 and looked on as another neighbor, Jim Harnish, entered the backyard and got appellant out of the house through a bathroom window.

While waiting for help to arrive, appellant kept telling McWilliams, "I must be crazy. I don't know why I did this." When asked what she meant, appellant explained that she had tried to commit suicide by loosening a gas pipe. McWilliams asked appellant if she knew that taking such action would cause the house to blow up. Appellant said she did not; she thought the gas would merely put them to sleep. McWilliams also remembered appellant saying something about her husband coming home and finding them before they died and taking them to the hospital so that everything would be all right.

Fire department personnel arrived on the scene and extinguished the fire. Afterwards, Pacific Gas and Electric employees and fire investigators entered the house to inspect the gas appliances in an attempt to ascertain the cause of the explosion and fire. Upon doing so, they discovered the gas stove had been pulled away from the wall and the flexible line connecting the stove to the gas source had been disconnected. They also learned that a gas

valve linking the stove to the gas supply had been left wide open. The connections between the gas line and the stove were checked and found to be intact. These findings led the Pacific Gas and Electric supervisor to conclude that someone had unscrewed the pipe. The immediate area was searched for tools that could have been used to disconnect the pipe but none were found. When asked how long it would take for a house of appellant's size to fill with gas and ignite, the supervisor "guess[ed]" it would take several hours.

By inspecting the area in close proximity to the stove, the fire investigator was able to determine that the stove had been pulled away from the wall before the fire. He said the flex line had to have been removed "by a mechanical means." The investigator also determined that "most of all everything [referring to the windows and doors of the structure] was closed" prior to the explosion despite the fact that it was a nice day outside.[2] On cross-examination he could not recall the exact location of all the windows in the house or whether specific windows in the bedrooms were opened or closed. The investigator concluded that the disconnected gas line behind the stove was the origin of the fire but could not ascertain the source of ignition. He said it could have been a light switch, a remote control, or any electrical item in the structure within reach of the gas.

The two O'Connell children were transported to the burn center at the University of California, Davis Medical Center later the same day. Courtney, the older of the two at age three and one-half, suffered from either very deep second degree or third degree burns over 20 percent of her body. Most affected were her hands, feet, and face. Courtney had to be intubated because her throat had begun to swell shut due to smoke inhalation. She underwent one surgical procedure to her hands and remained hospitalized approximately two and one-half weeks due to the injuries sustained in the fire. Courtney was still in therapy roughly 15 months later and would likely undergo additional surgeries to correct some problems related to scarring.

Ashley, who was about two years of age at the time of the fire, suffered more extensive burns. Her face, back, feet, lower legs, and arms were all involved. She too had to be intubated to prevent her throat from swelling shut. She remained hospitalized until March 2, 1993, and by the time of trial, had undergone three, possibly four, surgical procedures. The doctors anticipated that Ashley, like her sister, would be in need of further surgical intervention to alleviate the scar-related difficulties she was experiencing.

The children's treating physician testified that both children could have died from their burns and inhalation injury had they not received proper medical attention within an hour of the incident.

---

[2]The inspector did note, however, that it had rained earlier in the day.

Meanwhile, Detective Green of the Stanislaus County Sheriff's Department contacted appellant while she was in the hospital and asked her to call him later if she so desired. Appellant telephoned the detective on the 12th of February and voiced her concerns over what type of criminal charges she might be facing in the future. She expressed her sorrow over what had happened and said she never intended to blow up the house.

Appellant admitted removing the gas line from the stove but said her intention was for the house to fill with gas and kill both herself and her two children. She said the three of them watched television in the living room while they waited for the house to fill with gas. About two hours later, appellant got up to go to the bathroom. While there, she began to have second thoughts about what she had done but before she could take any action, the house exploded.

No defense evidence was presented during trial.

## DISCUSSION

Appellant raises four separate issues for our consideration. For the reasons set forth below, we affirm.

### I., II.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### III.

*Issues Related to the Great Bodily Injury Enhancement*

At the time of appellant's trial, the relevant portions of section 12022.7 read as follows: "(a) Any person who, with the intent to inflict such injury, personally inflicts great bodily injury on any person other than an accomplice in the commission or attempted commission of a felony shall, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which . . . she has been convicted, be punished by an additional term of three years, unless infliction of great bodily injury is an element of the offense of which . . . she is convicted. [¶] . . . [¶] (d) As

---

*See footnote, *ante*, page 1182.

used in this section, 'great bodily injury' means a significant or substantial physical injury."[6]

■ Appellant claims the trial court committed reversible error when it refused to instruct the jury and allow defense counsel to argue that, in order to find the section 12022.7 enhancement true, the jury must find that appellant intended to inflict the specific type of great bodily injury actually sustained by the victim. She contends the use of the words "such injury" mandate the interpretation she urges upon us. In the event we agree with her interpretation and find reversal necessary, appellant insists retrial is barred due to the lack of evidence presented at trial to support a finding that she intended to kill her children by burning them. She argues that her intent, if any was found to exist, was to asphyxiate her children.

Relying on *People* v. *Johnson* (1993) 6 Cal.4th 1, 52 [23 Cal.Rptr.2d 593, 859 P.2d 673], and *People* v. *Andrews* (1989) 49 Cal.3d 200, 218 [260 Cal.Rptr. 583, 776 P.2d 285], respondent argues appellant's instructional claim is not cognizable on appeal because the instructions given accurately set forth the general principles of law on this issue; appellant simply failed to request clarifying or pinpoint instructions. Respondent alternatively asserts the claim is without merit since the specific intent required is the intent to inflict great bodily injury and not the particular type of injury actually sustained. With respect to the restrictions imposed on defense counsel's arguments, respondent counters that defense counsel actually argued the point to the jury. Finally, respondent urges us to reject appellant's insufficiency of evidence claim because it is unsupported by argument or citation to any supporting authority.

■ Before we reach the merits of appellant's claim, we must first address the issue of waiver. The record shows the jury was instructed in the language of CALJIC Nos. 2.02 and 17.20.[7] We believe these instructions, when read together, correctly state the general principles of law regarding

---

[6]Subdivision (a) was subsequently amended to read: "Any person who, with the intent to inflict *the* injury, personally inflicts great bodily injury . . . ." (Stats. 1994, ch. 873, § 3, italics added to changed language.) The definition of great bodily injury formerly contained in subdivision (d) is now found in subdivision (e).

[7]These instructions as read to the jury provided:

"The [specific intent] [or] [mental state] with which an act is done may be shown by the circumstances surrounding the commission of the act. But you may not find the defendant guilty of the offense charged [in Count(s) I and II, and the enhancements and allegations of Counts I, II, III and IV . . .], unless the proved circumstances are not only (1) consistent with the theory that the defendant had the required [specific intent] [or] [mental state] but (2) cannot be reconciled with any other rational conclusion.

"Also, if the evidence as to [any] such [specific intent] [or] [mental state] is susceptible of two reasonable interpretations, one of which points to the existence of the [specific intent]

the intent necessary to sustain a true finding on a section 12022.7 allegation. Indeed, CALJIC No. 17.20 employs the very language of section 12022.7 in defining the requisite intent. By comparison, the instruction urged by appellant seeks to clarify the meaning of "such injury" found within both section 12022.7 and CALJIC No. 17.20.

"Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language. [Citations.]" (*People* v. *Andrews supra*, 49 Cal.3d at p. 218; accord, *People* v. *Johnson, supra*, 6 Cal.4th at p. 52.) Respondent correctly notes that appellant made no such request.

Equally recognized, however, is the principle of law that excuses parties for their failure to raise an issue at trial where to do so would have been an exercise in futility. (*People* v. *Welch* (1993) 5 Cal.4th 228, 237 [19 Cal.Rptr.2d 520, 851 P.2d 802], and cases cited therein.) This is clearly such a case. Appellant's interpretation of the statute had been categorically rejected by the court on two occasions prior to the time the court and counsel engaged in discussions regarding instructions. We shall, therefore, address appellant's claim on the merits.

 This case presents us with the opportunity to revisit and build upon an earlier decision of this court concerning the specific intent referenced in section 12022.7. In *People* v. *Phillips* (1989) 208 Cal.App.3d 1120, 1123 [256 Cal.Rptr. 654], we noted that two lines of thought had developed

[or] [mental state] and the other to the absence of the [specific intent] [or] [mental state], you must adopt that interpretation which points to the absence of the [specific intent] [or] [mental state]. If, on the other hand, one interpretation of the evidence as to such [specific intent] [or] [mental state] appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable."

"It is alleged in Counts 1 and 3, that in the attempted commission and commission of the crimes therein described the defendant, with the specific intent to inflict such injury, personally inflicted great bodily injury on Courtney O'Connell.

"It is alleged in Counts 2 and 4, that in the attempted commission and commission of the crimes therein described the defendant, with the specific intent to inflict such injury, personally inflicted great bodily injury on Ashley O'Connell.

"If you find a defendant guilty of Counts 1, 2, 3, or 4, you must determine whether or not such defendant, with the specific intent to inflict such injury, did personally inflict great bodily injury, on Courtney O'Connell or Ashley O'Connell in the attempted commission of murder and the commission of endangering the person or health of a child.

" 'Great bodily injury' as used in this instruction means a significant or substantial physical injury. Minor, trivial or moderate injuries do not constitute great bodily injury.

"The People have the burden of proving the truth of this allegation. If you have a reasonable doubt that it is true, you must find it to be not true.

"You will include a special finding on that question in your verdict, using a form that will be supplied for that purpose."

concerning the specific intent referenced in section 12022.7 and made the following observations: "The Courts of Appeal agree that the enhancement provided for by section 12022.7 requires a specific intent to inflict great bodily injury. (*People* v. *Czahara* (1988) 203 Cal.App.3d 1468, 1475 [250 Cal.Rptr. 836]; *People* v. *Superior Court* (*Duval*) (1988) 198 Cal.App.3d 1121, 1132 [244 Cal.Rptr. 522]; *People* v. *Simpson* (1987) 192 Cal.App.3d 1360, 1365-1366 [237 Cal.Rptr. 910]; *People* v. *Bass* (1983) 147 Cal.App.3d 448, 454 [195 Cal.Rptr. 153]; see also *People* v. *Parrish* (1985) 170 Cal.App.3d 336, 343-344 [217 Cal.Rptr. 700].) There agreement ends. One line of thinking, led by *People* v. *Bass*, *supra*, 147 Cal.App.3d at page 454, holds that 'the "intent to inflict great bodily injury" is merely the intent to commit a violent act or the intent to commit a battery which is required for assault, and the intent requirement of section 12022.7 is met when such injury is caused by the deliberate act of the defendant, and not accidentally.' [Citation.] The other line of thinking, led by *People* v. *Simpson*, *supra*, 192 Cal.App.3d at page 1367, holds that '[t]he fact that the word "inflict". connotes causation by a particular means does not convert the requirement that the defendants have *intended to cause* great bodily injury into a mere requirement of "intent to commit an act" which happens to cause great bodily injury. [¶] The plain meaning of section 12022.7 is that the defendant must have intended to cause great bodily injury. The *Bass* court's construction of the statute to require only a general intent to commit a violent assault violates the rule that " '[w]hen statutory language is . . . clear and unambiguous there is no need for construction, and courts should not indulge in it.' " [Citation.]' "

We then held that section 12022.7, by its very terms, "requires not merely an intent to do the act which causes the great bodily injury, but an intent to cause such injury itself." (*People* v. *Phillips*, *supra*, 208 Cal.App.3d at p. 1123.) Otherwise, we observed, the statute would have been worded similarly to section 12022.8, which mandates a sentence enhancement for " '[a]ny person who inflicts great bodily injury, as defined in Section 12022.7, on any victim in a violation of [various enumerated statutes].' " (208 Cal.App.3d at p. 1123.)

On this occasion, we hold that the "intent to cause such injury" referenced in *People* v. *Phillips*, *supra*, 208 Cal.App.3d 1120, and section 12022.7 means the intent to cause great bodily injury and not, as appellant argues, the intent to cause the exact great bodily injury actually sustained by the victim. (But see *People* v. *Calderon* (1991) 232 Cal.App.3d 930, 937 [283 Cal.Rptr. 833].)

Case law dictates that we read statutes in a manner that will best serve the legislative intent. (*Morse* v. *Municipal Court* (1974) 13 Cal.3d 149 [118

Cal.Rptr. 14, 529 P.2d 46].) We believe our interpretation will best serve the legislative goal of imposing punishment commensurate with the degree of culpability which, in this case, equates to increased punishment for those who intentionally inflict great bodily injury.

The restrictive approach urged by appellant would, in contrast, frequently frustrate this purpose. An example demonstrates the point well. Assume a defendant, intending to stab the victim multiple times in the chest, misses and instead stabs the victim numerous times in the throat. Under appellant's interpretation, section 12022.7 would not apply because, while the defendant clearly intended to do the act that resulted in the victim suffering great bodily injury, and clearly intended to inflict great bodily injury, he/she did not intend to inflict injury to the victim's throat. The Legislature clearly could not have intended such a result and we refuse to read the statute so narrowly.

This is not to say that the criminal actor's intent plays no role. On the contrary, the jury cannot make its determination in a vacuum but must look to the facts of the case to determine whether the defendant specifically intended to inflict great bodily injury. As we noted in *Phillips*, this determination can be made by examining any direct evidence of the defendant's intent or inferred from the circumstances attending the act intentionally done which caused the great bodily injury, including the manner in which the act was done and the means used. (*People* v. *Phillips*, *supra*, 208 Cal.App.3d at p. 1124, and cases cited therein; see also *People* v. *Superior Court (Duval)*, *supra*, 198 Cal.App.3d at pp. 1132-1133 [court concluded that pregnancy followed by abortion constituted great bodily injury, but found no direct evidence that defendant specifically intended to impregnate victim and refused to infer that intent from the fact that defendant engaged in a single act of unlawful intercourse with the victim].) " 'It is black-letter law that a party is presumed to intend to do that which he voluntarily or willfully does in fact do and also presumed to intend the natural, probable and usual consequences of his own acts. [Citation.].'" (*Phillips*, *supra*, 208 Cal.App.3d at p. 1124.)

This does not mean, however, that the trial court should have stricken the enhancement or allowed defense counsel to argue that appellant did not intend the natural consequence of fire associated with filling a house with natural gas. As to the former, substantial evidence shows that appellant intended to inflict great bodily injury upon her children (i.e., death), and that she also intended to and did in fact commit the act which resulted in the infliction of great bodily injury (i.e., filling the house with natural gas). Thus, the court did not err in failing to strike the enhancement. As to the

latter, no evidence was presented to the jury to show appellant did not intend the probable consequences of filling her house with natural gas. Hence, the trial court did not err in refusing to allow defense counsel to argue appellant did not intend to burn her children.

## IV.

### *Sufficiency of the Evidence to Support the First Degree Attempted Murder Conviction*\*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

The judgment is affirmed.

Vartabedian, J., and Harris, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 15, 1996.

---

\*See footnote, *ante*, page 1182.