Filed 5/13/21  P. v. Ramirez CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>BENJAMIN CHRISTINO RAMIREZ,<br><br>Defendant and Appellant. | B301539<br><br>(Los Angeles County Super. Ct. No. TA147299) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Tammy Ryu, Judge.  Affirmed with modifications.

Jin H. Kim, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Paul M. Roadarmel, Jr., and Stephanie A. Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

Benjamin C. Ramirez (defendant) appeals his conviction of first degree murder (Pen. Code, § 187, subd. (a)) following a jury trial. The jury found true the allegations that appellant personally used a firearm within the meaning of Penal Code section 12022.5, subdivision (a), and personally and intentionally discharged a firearm causing great bodily injury and death within the meaning of Penal Code section 12022.53, subdivision (d). Appellant was sentenced to 35 years to life. The sentence consisted of 25 years to life for the murder plus 10 years pursuant to Penal Code section 12022.5. The court struck the allegation pursuant to Penal Code section 12022.53. The court found defendant was not entitled to any custody credits.

On appeal, defendant contends that the trial court erred in admitting statements made by his wife, the victim. Defendant further contends that his trial counsel was ineffective in failing to object to the admission of those statements, which he claims violated his constitutional rights; that the trial court erred in declining to give a limiting instruction regarding the statements; that his counsel was ineffective for failing to request such an instruction; and due to cumulative error, reversal is required. Finally, defendant claims that the trial court erred in failing to award him 352 days of presentence custody credits, with which the People agree. Finding no other error, we order that the judgment be modified to reflect 352 days of presentence custody credits, and affirm the judgment in all other respects.

## STATEMENT OF THE CASE

Defendant was charged by information with the murder of his wife, Fely Ramirez.[1]  It was also alleged that defendant personally used a firearm and personally and intentionally discharged a firearm causing death.

Following a jury trial defendant was found guilty of first degree murder, and the firearm allegations were found to be true. On October 1, 2019, the court sentenced defendant to 25 years to life and a consecutive term of 10 years for the Penal Code section 12022.5, subdivision (a) firearm enhancement.

## FACTUAL BACKGROUND

### Prosecution evidence

#### *Defendant's strained relationship with Fely*

Defendant, who was 69 years old at the time of the murder, and Fely, who was then 67 years old, had been married for over 40 years.  They had two adult children, Philip Ramirez and Kimberly Ramirez-Chan.  Philip lived in New York and Kimberly lived in Los Angeles.  Both Philip and Kimberly were in regular contact with Fely, but not with defendant.

Fely had been a supervisor at Northrup Grumman, while defendant held various jobs.  Defendant and Fely owned rental properties in Pomona and lived together in a house in Carson. However, they had grown distant and their marriage was troubled.  They had been sleeping in different bedrooms for about 10 years.

---

[1]     Defendant's wife and children will be referred to by their first names to avoid confusion.

3

In September 2016, Fely told Kimberly that she had spoken to defendant regarding divorce and that defendant said, "I'll kill you before you take away my Pomona houses."

In November 2016, Fely met with family law attorney, Sandy Roxas, for an initial consultation. Fely did not contact Roxas again until August 2017, when she retained Roxas. Several days later, Fely instructed Roxas to stop working on her case. In July 2018, Fely told Roxas she was ready to proceed with a divorce. Roxas filed a divorce petition on August 31, 2018.

In a group text to Philip and Kimberly about a month before her death, Fely wrote, "I told him you guys are helping me to get a divorce!! He said he won't sign and I told him you don't have to sign anything!! [¶] . . . [¶] . . . Then he said, you're keeping your pension and keeping my dad's houses, rentals. [¶] . . . I said go ahead I don't live for money!!!!" Around the same time, Fely sent Philip a copy of a text message that Philip believed Fely had sent to defendant. The message stated that if defendant wanted half her pension, "so be it" because money did not make her happy. Fely also reminded defendant that she helped to pay for the improvements to their home and the rental properties and that defendant never acknowledged her contributions.

***Service of divorce papers***

Roxas explained to Fely that after filing the petition for dissolution, the petition and related documents had to be served on the spouse by a third party. Fely collected the documents from Roxas's office. Fely was planning to have Kimberly serve the documents on defendant. Kimberly attempted service on defendant on two occasions, but he was not there. Kimberly hid the documents in Fely's bed.

4

Fely returned to Roxas's office on October 4, 2018, and reported that her daughter had been unable to serve the paperwork. Fely returned the documents to Roxas with instructions to hire a process server. Later that day, Fely returned to the office and retrieved the packet because she had obtained her own process server: Chris Demirdjian.

On October 5, 2018, Fely, Kimberly, and Philip texted each other. Fely wrote, "I'm so scared! And nervous! He came home almost same time as the night before. Around or past midnight." Philip responded that if defendant was at home, she could have him served. Fely texted that she was meeting the process server that morning at Carl's Jr. to pay him and bring him to the house. Fely then forwarded a text message from the process server that his phone had died and that he could meet Fely at Carl's Jr. at 9:30 a.m.

Demirdjian met Fely at the Carl's Jr. about a mile and a half from her residence. A security video from across the street showed both Demirdjian's car and Fely's Honda Accord arriving at the residence at 9:17 a.m. The two went through a side gate to the back patio area where Fely called out for defendant. When defendant poked his head out of a sliding door, Demirdjian threw the divorce papers inside. Defendant tried to shut the sliding glass door, but Demirdjian managed to throw the paperwork inside the house. Demirdjian then left the residence, leaving Fely in the backyard. Later that evening, Demirdjian attempted to contact Fely about giving her a proof of service, but he could not reach her.

At 10:02 a.m., the security camera across the street captured defendant leaving the residence from the front door and driving away in the Honda Accord.

At 10:34 a.m., Kimberly texted Fely, "Any updates?" She did not receive a response to her message. Both Kimberly and Philip tried calling Fely, who did not answer, which was unusual.

Fely's children contacted Roxas's office and left messages indicating that they were looking for Fely and were concerned. The children requested information on Fely's license plate number because they wanted to look for her vehicle.

Philip called the sheriff's department and asked them to do a wellness check. Los Angeles County Sheriff's Deputy Charles Smith conducted a welfare check at Fely and defendant's residence. He rang the doorbell several times and looked around the property to ascertain if anyone was in the house. He called out a name but did not hear a reply. He did not see anyone, and the house was locked and secured.

### Discovery of Fely's body and evidence

Kimberly and Philip contacted Don Ocubillo, Fely's niece's husband, and explained that Fely had served defendant with divorce papers. Kimberly asked Ocubillo to go to the Carl's Jr. and to Fely's house to see if Fely was there. Ocubillo went to the Carl's Jr. but did not see Fely or her car. He then went to Fely and defendant's home, where he saw defendant's truck in the driveway. Ocubillo checked the perimeter of the house, knocked on doors, tried to call both Fely and defendant and sent them text messages. Ocubillo got no response. He became concerned because Fely and defendant were usually quick to respond.

Ocubillo called Kimberly and Philip and told them he needed to pick up his daughters from school, but would return later with the house key that he had. When Ocubillo and his daughters returned with the key, Ocubillo told his daughters to wait outside. When he took a few steps inside, he noticed

6

someone sitting on the sofa.  Ocubillo approached and recognized Fely, who appeared to be sleeping because she was covered by a blanket that ran from her feet to her neck.  He kept calling her name, but she did not respond.  He touched her hand, which was "ice cold."  She did not appear to be breathing.  The blanket fell off, and when Ocubillo went to check for a pulse, he saw blood on Fely's head and neck.  She had papers on her lap.  Ocubillo noticed a hole in Fely's chest.  When Ocubillo heard his daughters asking to come inside, he ran outside and told his daughters to get in the car.  He then called 911.  Ocubillo also called Kimberly and Philip.

Detective Jason Parolini responded to the 911 call and spoke briefly to Ocubillo before going inside where he saw Fely seated on a couch with her feet on an ottoman.  A red blanket was pulled up to her torso.  Parolini checked for a pulse on the left wrist, which was "extremely stiff."  Paramedics arrived and they declared Fely dead at the scene.  Fely died from multiple gunshot wounds, including shots to the left temple, upper chest, and left breast.  The shots were fired in quick succession because all three wounds showed hemorrhaging.  Three expended bullets were later recovered from her body and booked into evidence.

Parolini pulled the blanket down and saw that divorce papers were sitting on Fely's upper legs.  He placed the paperwork on a nearby coffee table.  He noticed black marks with holes in Fely's shirt over her chest.  She had blood dripping from her mouth, and there were indications that the shots were fired at close range.

Detective Steven Sully and Deputy Daivat Jani also responded to the home.  They found Fely's body sitting on the couch with her feet on an ottoman.  Sully found one casing in the

living room and one in the adjacent sun room. Both were "10/22 long rifle" casings. Sully and Jani found a shotgun in the bedroom, along with some ammunition for the shotgun, flags designed to be placed in the muzzle of a gun, and a "10/22" handgun. There was also a safe containing additional firearms and ammunition. A total of five firearms were recovered, which included two shotguns, a rifle, a handgun with a wooden grip, and the .22-caliber handgun. Four of the guns were registered to defendant. The firearms and ammunition were booked into evidence.

The recovered casings were fired from the recovered .22-caliber Browning handgun. The three expended bullets recovered from Fely's body were fired from the same handgun. The gun had a safety switch and a "disconnector," which required the shooter to "release the trigger and pull it again" in order to fire a subsequent shot. The gun had a trigger pull of three and three-quarter pounds. There were no signs of forced entry in the house. A copy of the divorce summons was booked into evidence.

Handwritten notes were discovered in a gun safe in a box labeled "chocolate ammo." In a three-page note in Fely's handwriting, dated December 7, 2017, was written:

> "You cannot treat me nice one day and treat me like a piece of shit the other days! Why? What did I do to you? Got a living trust is that why? We have been married for 41 years. I did not do that until you have an affair! You disregard me and don't respect me. You control the rental money. When I used to—when I use rental money is because I need to pay bills. Such as property taxes and Citibank credit card! I am so tired of fighting! You go ahead and do whatever you want. Leave me in peace. Because I know you'll be back to being mean to me in no time!

You are better off without me and vice versa same goes to me!"

A second note in defendant's handwriting stated:

"What you are doing! [*Sic.*] You are taking the advice of Letty! She wants you to have everything. In parentheses, greed. This is why she is divorce with Ben, comma, and he treat her like shit! There is never another person if there was I would have left you long ago!!!"

### *Defendant's actions after the murder*

A video camera from the house directly across the street showed defendant exiting the front door of the home at 10:02 a.m. and driving off in Fely's silver Honda Accord on the day of the murder. At 10:52 a.m., defendant withdrew $10,371.04 from two Bank of America accounts held jointly by Fely and him, leaving both accounts with zero balances. At 11:40 a.m., defendant went to Wells Fargo, where he also held joint accounts with Fely, and made a cash withdrawal of $111 from one of the accounts, leaving a balance of zero.

Olivia Garcia was a tenant in a residence in Pomona that was owned by defendant and Fely in October 2018. Garcia had been paying the rent online by transferring it into defendant's account. At 3:15 p.m. on the day of the murder, Garcia received a call from defendant, who told her that the account would be closed and that Garcia should pay rent to his brother since defendant was getting divorced from Fely. Garcia's daughter, Juliana, who lived with Garcia, also talked to defendant, although she could not recall the date. They discussed rent, and defendant told her that his brother would be managing the property. At some point defendant went to the house, and Juliana gave him the water bill. Around 3:30 p.m., defendant

9

called another tenant, Lizeth Calvillo, and told her that future rent payments should go to his brother.

On October 6, 2018, the day after the murder, Detective Sully returned to the residence after a neighbor spotted defendant in a car on a street behind the house. Defendant was detained and then released on October 8, 2018. Defendant was arrested again on October 18, 2018, in Pomona. After his arrest, defendant sent two letters to Garcia and her daughter explaining that he and Fely had divorced and provided information where rental payments should be made. Defendant asked if Garcia was able to open a new utility bill in her name and for Garcia's phone number so he could call her collect. He also suggested she could write or visit him if she needed to reach him. He also sent a letter to Calvillo, but she did not open it.

### *Defendant's interview with police*

On October 19, 2018, Detective Carrillo and his partner, Sergeant Troy Ewing, interviewed defendant. The interview was recorded.

Defendant had type 2 diabetes and took seven different types of medication. He admitted that all of his medication was at his house, but he did not want to return there because Fely had served him with divorce papers. Defendant stated that Fely and "her son" had been trying to get him out of the house for the past six months. He admitted that he and Fely had drifted apart and that they slept in separate bedrooms for a decade. Defendant also admitted that he collected firearms and had a "556 AR-15," a "KSG shotgun," and a ".22 Browning Buck Mark." Defendant kept his guns in a safe, and only he knew the combination. Defendant normally kept the guns unloaded, but after an

10

intruder entered the house recently, he decided to keep the ".22" loaded in case it happened again.

Defendant remembered being served divorce papers by a tall, heavyset male. After the process server dropped the papers at his feet, Fely stated, "You've been served." Defendant begged Fely not to divorce him and that he would do whatever she wanted. However, Fely said no, because she was "already in that mode" and was "dead set in leaving and going."

Fely sat down on the couch. She told defendant that she did not love him anymore. Defendant was hurt and again begged her not to divorce him. Defendant claimed that Fely was "going on and on" about how "evil" or bad defendant was and how he mistreated her. Defendant recalled crying. He added, "I swear to God it's like—it's almost like she's—she's very nice and calm in one minute and the next minute she can be like talking bad about a person."

Defendant went to his bedroom and retrieved the semiautomatic handgun and loaded the shotgun.[2] He believed the semiautomatic was already loaded. He intended to shoot himself with the shotgun.

Defendant did not intend to kill Fely and again asked her not to divorce him. He remembered just "pop, pop, pop and—and everything blanked." Fely was sitting on the couch when he first shot her. He placed the divorce papers on her lap, but he did not know why. Defendant insisted that he had not intended to shoot Fely and that he had not shot her in the head. Instead, defendant shot her "in the center mass." Defendant stated that

---

[2]     Later in the interview, defendant stated that he did not recall going into his bedroom or opening the gun safe.

11

everything went blank after he heard the first shot, but later conceded that he remembered pointing the gun at Fely's chest.

Defendant returned to the bedroom and placed the gun on the bed. Defendant had intended to kill himself, and did not know why he did not kill himself.

Defendant then got in the car and drove "anywhere." He did not remember where he had shot Fely and did not know she was dead. After driving for some time, defendant "could barely move and walk" because he had not taken his insulin. He felt as if his joints were "paralyzed." Defendant stated that when he is sick, he forgets things. At the time of the killing, he had not taken his insulin for about 15 or 30 days because he had run out of it.

Defendant was driving on "PCH" when the vehicle's wheel detached. He eventually drove back from Seal Beach to his home with a flat tire. He parked in the back. He planned to get his medications by climbing over the fence. Defendant did not park in the front because he did not feel it would be smart to do that, and it was more convenient to park in the back. Defendant never made it over the fence because he was arrested.

Defendant did not mention closing the bank accounts or contacting the tenants during the interview.

**Defense evidence**

Defendant did not present any evidence on his behalf.

## DISCUSSION

### I. Hearsay statements

Defendant argues that the trial court erroneously admitted several of Fely's statements that mischaracterized defendant as a money-obsessed man who disrespected and mistreated her,

12

cheated on her, and threatened to kill her if she tried to get possession of the rental properties. In addition, defendant argues that some of the statements should have been excluded under Evidence Code section 352 as being substantially more prejudicial than probative.[3]

## A.   *Relevant procedural background*

Prior to trial the prosecution sought to admit a number of statements by Fely, including (1) text messages between Fely and her adult children on the morning of her murder; (2) the notes written by Fely and defendant that were kept in the gun safe; and (3) text conversations between Fely and her adult children regarding Fely's relationship with defendant and her fear of him. The prosecution argued that the hearsay rule did not bar admission of the statements pursuant to sections 1250 and 1251, which permit admission of a declarant's state of mind. Fely's statements showed that she was afraid of defendant, that he was mean to her, and that she was scared of serving him with divorce papers. The messages were also relevant to establish a motive for the murder.

The prosecution also argued that some of the statements were admissible to show the effect on the listener. The statements explained why Kimberly supported her mother's efforts to obtain a divorce, assisted her mother by attempting to serve the divorce papers, and became concerned when Fely did not respond to her texts. The prosecution also argued that the statements were admissible under sections 1240 and 1241, which allow the admission of spontaneous and contemporaneous

---

[3]   All further statutory references are to the Evidence Code unless otherwise noted.

13

statements.  The prosecution argued that some of the text messages fell into this category, as they narrated Fely's actions on the day of the murder.

In response, defendant argued that the statements did not show that Fely feared defendant and that Fely's state of mind was not an issue in the case.  Defendant also argued that the statements should be inadmissible under section 352.

The trial court held a hearing on the admissibility of Fely's statements.  The court inquired as to whether the statements would be admissible only after the defense presented its evidence or its theory of the case.  The prosecutor responded that defendant had claimed in his interview that he begged Fely to stay and told her that he would do whatever she wanted, but that Fely rejected him.  Because defendant had put Fely's state of mind at issue, these statements were admissible to show that Fely was afraid of upsetting defendant, had to "walk on egg shells" around him, and attempted to "kowtow to him."  Fely's statements contradicted the suggestion that she was sitting on the couch with her feet up on an ottoman in a state of repose at the time of the murders.

Defense counsel argued that the statements did not show that Fely feared defendant and that Fely's state of mind was not at issue in the case.  Defense counsel reiterated that the evidence was more prejudicial than probative.

The court agreed that Fely's state of mind was at issue in the case but was concerned about the trial devolving into a trial about defendant and Fely's marriage.  The court noted that Fely's "fear for her safety" was relevant.  The court also found that "any reference to financial gain or financial issues" was relevant to premeditation and deliberation, as well as malice.  Further, the

14

statements giving defendant notice that Fely wanted a divorce were relevant to heat of passion and whether defendant was surprised when served with the divorce papers. The court agreed that the text messages were relevant to give a timeline to events and give context to Kimberly's and Fely's actions on the day of the murder.

The court stated:

"So her state of mind including her going to the divorce attorney to file for divorce, prepare for it, telling the defendant that she intended to divorce him because there are some text messages regarding that, her text messages—and that especially goes to defendant having notice that his wife intended to do this sometime soon that he cannot then claim that it came as a surprise and so—and therefore he was shocked, surprised, and he committed the crime out of some sort of a severe emotional state such as crime of passion."

The court ruled that any statements regarding Fely's fear of defendant were not admissible unless her fear became an issue in the case. The court continued:

"So any text message or statements made to a third party about her intention to divorce the defendant, any statements made to the defendant about her intention to divorce him is all relevant. And it is at issue in the case because that goes to motive for the shooting or the killing that she's going to divorce him. . . . So anything that pertains to those areas, I'm inclined to admit them under 1250 and 1251."

The parties also argued over the admission of defendant's statement "I'll kill you before you take away the Pomona houses" made two years prior to the murder. Defendant argued that the statement was remote in time and was more prejudicial than

15

probative.  Counsel added that the statement was based on "Kimberly's recollection of something that Fely said."

The court was inclined to allow the statement because it was relevant to motive as well as a lack of surprise when the divorce papers were finally served.  The court found that the probative value of the statement outweighed any prejudice.

Pursuant to its rulings, the trial court admitted the following: (1) Fely's September 2016 statement to Kimberly in which Fely said that defendant told her, "I'll kill you before you take away my Pomona houses"; (2) Fely's written note dated December 7, 2017, that was found in defendant's gun safe, indicating that defendant did not respect Fely and that they were better off without each other; (3) Fely's text messages to Kimberly and Philip in the month or two before the killing, where Fely told defendant that they were helping her get a divorce, which included a discussion of how they would divide their assets; (4) a screenshot of a text that Philip believed Fely had sent to defendant;[4]  (5) a text message that Fely sent Kimberly

---

[4]     The screenshot read: "So the way it is now is fine.  I cannot be happy few months and be treated mean the next day.  All that is important to me are our children.  I want to spend time with them as much as I can.  Both Philip and Kim are not money hungry.  If you want half of my pension so be it.  Money doesn't make me happy.  Don't forget that all these improvements in this house in Carson and some of rental improvements came from my pension and some from the rents.  Of course you never ever acknowledge that without my good job you won't have what we have now.  The rental came into our life in 2007.  I've been working at TRW Northrop since 1983 to 2014.  I'm not downgrading your jobs at Radio Shack, Optima and Sams.  Of course that helps a lot too.  But you never realize."

and Philip on October 4, 2018: "I hired my own messenger. He's coming to the house, I'll open the door and lead the messenger to dad. It doesn't matter if he takes it or not. Messenger can drop it off—drop it on his feet, and considered that served. Coming at 8 tomorrow. So if I'm home he's home. I can contact the guy by phone in case he runs away, dad is [*sic*]" and the following text exchange among Fely, Philip and Kimberly on the morning of October 5, 2018:

> Fely: "I'm so scared! And nervous! He came home almost same time as the night before. Around or past midnight."

> Philip: "Is he home now can you call server."

> Fely: "Yes but I need to give him the packet and pay him up front. I'll meet him at Carl's Jr. at 8:30. Then he will go from there."

> Philip: "OK."

> Fely: "I'm hoping dad will be in living room or kitchen instead of me leading the server to the bedroom. [¶] . . . [¶] He's up and cooking the fish he caught! Fishes."

> Philip: "Get him."

> Fely: "Oh shit!!! [Forwarding text from process server saying:] 'Hello Fili. I just saw your message. My phone died. I can meet you at 9:30.[']"

> Fely: "It's killing me."

> Philip: "Tell him to hurry."

> Fely: "Now another hour. I know I told him."

> Kimberly: "Any updates?"

Defendant argues that Fely's statements were offered for their truth, quoting the court: ". . . I'm assuming so. Because she's using 1250 which is an exception to . . . hearsay."

Later, during a discussion about jury instructions, defense counsel requested CALCRIM No. 303 (limited purpose evidence) for Fely's 2016 statement that defendant threatened to kill her, arguing that the statement was not offered for its truth but to show motive. Thus, the jury should be given a limiting instruction. The prosecution disagreed, stating, "I think it came in to show that that goes toward his motive which would be an intent to kill which would mean the truth of the statement presented." The court declined to give the limiting instruction.

### B. *Standard of review*

A trial court's ruling on the admissibility of evidence is reviewed for abuse of discretion. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113, disapproved on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151.) "Under this standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*Guerra*, at p. 1113.)

### C. *Applicable law*

"Under the hearsay rule, subject to several exceptions, 'evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated' is generally inadmissible." (*People v. Kovacich* (2011) 201 Cal.App.4th 863, 884.)

One exception to the hearsay rule is section 1250, which allows the admission of "'evidence of a statement of the declarant's then existing state of mind, emotion, or physical

sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health).'" (*People v. Kovacich, supra*, 201 Cal.App.4th at p. 884.)[5]  This exception only applies if the declarant's mental state or conduct is at issue.  Thus, the trial court must find that such evidence is relevant to an issue in dispute.  (*People v. Riccardi* (2012) 54 Cal.4th 758, 814 (*Riccardi*), disapproved on other grounds in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.)

Direct declarations of an individual's state of mind, "e.g., 'I am afraid of [defendant],'" are hearsay but are considered

---

[5]      Section 1250 provides, in full:

"(a)  Subject to section 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when:

"(1)  The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or

"(2)  The evidence is offered to prove or explain acts or conduct of the declarant.

"(b)  This section does not make admissible evidence of a statement of memory or belief to prove the fact remembered or believed.

Section 1251 parallels section 1250, subdivisions (a)(1) and (b), except it concerns a declarant's previously existing state of mind as opposed to the declarant's state of mind at the time the statement was made.  For the purposes of this discussion, we refer only to section 1250.

19

exceptions under section 1250.  (*Riccardi, supra,* 54 Cal.4th at p. 822.)  Such statements are hearsay because they are offered to prove the truth of the matter asserted—that the declarant feared the defendant.  (*Ibid.*)  In such cases, the declarant's state of mind must be relevant to the case.

Indirect declarations of the declarant's state of mind are not hearsay because they are admitted to circumstantially prove the declarant's state of mind or conduct, not to prove the truth of the statements.  (*Riccardi, supra*, 54 Cal.4th at p. 823.)  An example of such a statement would be, "'[Defendant] kidnapped me at gunpoint.'"  (*Ibid.*)  The statement is not hearsay to the extent that it is admitted to show circumstantially the declarant's state of mind or conduct.  "This nonhearsay category of statements presents an elevated danger of prejudice if the jury is unable to distinguish between the truth of the matters asserted and the inferences concerning the declarant's state of mind."  (*Ibid.*)  While a limiting instruction may ensure that the jury does not consider the statement for the truth of the matter asserted, "[g]enerally speaking, absent a request, the trial court has no duty to give an instruction limiting the purpose for which evidence may be considered."  (*Id.* at p. 824.)  However, when a party does request a limiting instruction, and the evidence is admitted for a limited purpose, the trial court must give a limiting instruction.  (§ 355 ["When evidence is admissible as to one party or for one purpose and is inadmissible as to another party or for another purpose, the court upon request shall restrict the evidence to its proper scope and instruct the jury accordingly."].)

Even when admissible under one of the exceptions to hearsay, out-of-court statements are only admissible if relevant

20

to an issue in dispute. (*Riccardi, supra*, 54 Cal.4th at p. 814.) Evidence is relevant if it has any tendency to prove a disputed fact that is of consequence in the action. (*Id.* at p. 815.) Evidence that tends to establish material facts such as identity, intent, and motive is generally admissible. (*Ibid.*) However, under section 352, a trial court has the discretion to exclude evidence if its probative value is substantially outweighed by the probability the evidence will create a substantial danger of undue prejudice. A trial court enjoys "broad discretion" under section 352 to admit or exclude evidence. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124, abrogation on other grounds recognized in *People v. Leon* (2020) 8 Cal.5th 831, 848.)

### D. *The trial court did not abuse its discretion in admitting the disputed statements*

#### 1. *Fely's September 2016 statement to Kimberly*

Defendant first challenges the trial court's admission of his 2016 statement to Fely that "I'll kill you before you take away my Pomona houses." In making his primary argument, defendant focuses only on the portion of this analysis whereby Fely relayed the defendant's words to Kimberly. Defendant argues that the statement was not admissible under section 1250 because it was not a direct declaration of Fely's state of mind. The statement did not directly declare that Fely feared defendant, that she intended or planned to do something, or that she was experiencing any physical sensation. In addition, defendant argues, the statement was expressly forbidden under section 1250, subdivision (b). That section forbids the use of the state-of-mind exception to admit evidence of a hearsay statement of memory to prove the fact remembered.

21

Defendant relies on *People v. Armendariz* (1984) 37 Cal.3d 573 (*Armendariz*) (superseded by statute on another point as stated in *People v. Cottle* (2006) 39 Cal.4th 246, 255). In *Armendariz,* the defendant argued that the trial court erred in admitting testimony that the defendant had previously threatened physical violence against the victim. (*Armendariz*, at p. 585.) In response to the defense's objection, the trial court deemed the testimony admissible because it was admitted for the nonhearsay purpose of explaining why the witness went to the victim's house to protect him. The Supreme Court found that this ruling was erroneous. The high court explained: "A hearsay objection to an out-of-court statement may not be overruled simply by identifying a nonhearsay purpose for admitting the statement. The trial court must also find that the nonhearsay purpose is relevant to an issue in dispute." (*Ibid.*) The court found that the witness's reason for going to the victim's house on that prior occasion "had no bearing whatsoever on any issue in the trial." (*Ibid.*)

Defendant also relies on *People v. Arcega* (1982) 32 Cal.3d 504. In *Arcega*, the contested testimony consisted of statements from the victim's mother that the defendant was treating the victim weirdly, following her around the apartment, that she was afraid of him, and that she had asked him to move out. (*Id.* at p. 526.) The trial court admitted the testimony based on the state-of-mind exception, finding that it established the victim's mental state and fear of the defendant. The Supreme Court reversed, determining that "there was no issue of fact raised by the defense with respect to [the victim's] conduct immediately preceding her death." (*Id.* at p. 527.) The defendant "did not claim that his act of homicide was immediately preceded by any

conduct by the hearsay declarant."  Instead, the defendant "had admitted committing the killings after [the victim] had gone to sleep."  (*Ibid.*)  The defense had not raised any conduct by the victim immediately preceding her death that may have provoked the defendant.  (*Ibid.*)

Here, Fely's state of mind was also at issue.  Fely's fear of defendant helped to explain her actions in delaying her divorce for so long even though she made known to defendant that she intended to divorce him.  In addition, Fely's fear of defendant undermined any suggestion that she intended to provoke him at the time she served the divorce papers.  (*People v. Jablonski* (2006) 37 Cal.4th 774, 820 (*Jablonski*) [fear may be at issue when the victim is said to have behaved in a manner inconsistent with that fear].)  To the extent that the statement was admitted to show Fely's state of mind, or explain her actions, it was either not hearsay or qualified under the hearsay exception.  (*Riccardi, supra*, 54 Cal.4th at p. 823.)

There were also issues concerning Fely's behavior and whether defendant reacted in the heat of passion to Fely's actions.  Specifically, defense counsel argued to the jury that defendant's crime "bumps down to voluntary manslaughter" if "we take away the willfulness, the premeditation, the deliberation, the malice."  In closing, defendant's counsel argued that there was "an intense emotional reaction," and that defendant acted "rashly" under the "impulse of emotion."  Defendant was asking the jury to find that he acted "rashly and without time for judgment and reflection."  Defendant argued that "if you lose it and act rashly without reflection from this intense emotion, we treat that as something different than if you cold bloodedly decide you are going to kill someone."

Because defendant was arguing that he should be convicted of the lesser crime of voluntary manslaughter, defendant put at issue the question of whether Fely's act of serving him with divorce papers caused him to "lose it and act rashly." Thus, whether defendant was expecting to be served with divorce papers and had time to plan his response—or, on the other hand, whether Fely's act of serving him with the papers took him off guard and caused him to "act rashly" were issues for the jury to decide. The jury had to determine whether defendant knew his wife intended to divorce him. His statements concerning what he would do if she tried to take certain property were highly relevant to explain his motive. Further, "the hearsay rule does not prevent evidence of a statement made by a party from being admitted against that party." (*People v. Dennis* (1998) 17 Cal.4th 468, 528, citing § 1220; accord, *People v. Davis* (2005) 36 Cal.4th 510, 535 ["A defendant's own hearsay statements are admissible."].)

The trial court did not abuse its discretion in determining that defendant's statement that he intended to kill Fely if she took his Pomona properties was admissible as evidence of motive or intent (§ 1250, subd. (a)), and a statement of a party (§ 1220). Fely's transmission of this statement to Kimberly showed Fely's fear and explained her actions. The trial court did not abuse its discretion in admitting the statement. To the extent that our analysis differs from that of the trial court, "'"we review the ruling, not the court's reasoning and, if the ruling was correct on any ground, we affirm."'" (*People v. Brooks* (2017) 3 Cal.5th 1, 39.)

24

**2.** *Fely's December 7, 2017 note*

Defendant argues that the contents of Fely's December 7, 2017 note to defendant, which was found in the gun safe, were inadmissible. In the note, Fely explained that defendant alternated between treating her well and treating her "like a piece of shit." She asked if the poor treatment was because she had gotten a living trust, and that she did so only because he was having an affair. She complained that defendant disregarded and disrespected her and controlled the rental money. She told defendant he could do whatever he wanted, but asked that he leave her in peace, and that they were better off without each other. The note contained a direct declaration of Fely's state of mind: "I am so tired of fighting!"

The statements in Fely's note were not admitted for their truth. The prosecution was not trying to prove that defendant treated Fely poorly, that she got a living trust, or that defendant had an affair. Instead, the trial court admitted these statements on the ground that they showed Fely's state of mind and her intention to divorce defendant, and undermined defendant's claim that "he was shocked, surprised, and he committed the crime out of some sort of a severe emotional state such as crime of passion." The statements in the note were properly admitted for this nonhearsay purpose. Out-of-court statements may be admitted to show their "effect on defendant," particularly where the statements have bearing upon the question of premeditation. (*Jablonski, supra*, 37 Cal.4th at p. 820.) Defendant placed at issue the question of Fely's state of mind and his knowledge of her intention to divorce him by arguing that he killed her in the heat of passion.

25

Again, defendant's position that Fely's state of mind was not an issue in the action is unavailing. Fely's state of mind was put in issue by defendant, who argued that defendant lost control and acted rashly when he killed her. Under the circumstances, the prosecution was entitled to show that Fely was unhappy in the marriage, feared defendant, intended to divorce defendant, and had let him know this well in advance of serving the divorce papers. No abuse of discretion occurred.

### 3. *Fely's text messages to Kimberly and Philip in the months before the killing*

In the month or two before the killing, Fely sent text messages to Kimberly and Philip to let them know that she told defendant that they were helping her obtain a divorce. She also recounted what defendant said in return—that he would not sign divorce papers, and "you're keeping your pension and keeping my dad's houses, rentals." Fely then relayed, "I said go ahead I don't live for money!!!!" This exchange occurred about a month before Fely's death.[6] Defendant argues that the text messages did not directly declare her state of mind. Instead, they relayed what Fely said to defendant and what defendant said in return. Defendant argues that the statements were admitted for the

_____

[6] Also included in this discussion is a text that Fely sent to defendant and then forwarded to Philip, in which Fely told defendant that neither Philip nor Kimberly were money hungry, and that if defendant wanted half her pension, "so be it. Money doesn't make me happy." Like the other texts around the same time period, these statements were admitted to show their effect on defendant and were relevant to dispute his claim that he acted under a heat of passion. In addition, they showed Fely's state of mind—that she was unhappy in the marriage, wanted a divorce, and was beginning negotiations with defendant on this subject.

26

truth about events remembered, therefore their admission is barred under section 1250, subdivision (b).[7] Defendant also argues that, for the same reason, the statements cannot be admitted as nonhearsay circumstantial evidence of Fely's state of mind.

The text messages between Fely and her children relaying Fely's statements to defendant about the impending divorce, and defendant's reaction to it, were not admitted for their truth. The prosecution was not attempting to prove that Fely's children were helping her with her divorce, or that Fely intended to take certain items of property in the divorce. Instead, the statements were admitted to show their effect on the parties. Fely's desire for a divorce was relevant to prove defendant's motive in murdering her. Both defendant's state of mind and Fely's state of mind were put into issue by defendant by raising a heat-of-passion defense. For the reasons set forth above regarding the evidence previously discussed, the trial court did not abuse its discretion in admitting these statements.

### 4. *Fely's statements to Kimberly and Philip the day of the killing*

On the morning she was killed, Fely texted her children that she was "so scared! And nervous! He came home almost same time as the night before. Around or past midnight." She also wrote about the process server, ". . . I need to give him the packet and pay him up front. I'll meet him at Carl's Jr. at 8:30. Then he will go from there." She expressed her hope that the defendant would be in the living room or kitchen so that she did

---

[7] Section 1250, subdivision (b), provides that the section "does not make admissible evidence of a statement of memory or belief to prove the fact remembered or believed."

not have to lead the process server to the bedroom.  She noted that defendant was awake and cooking fish and then wrote "Oh shit!!!" and conveyed that the process server would be delayed. Fely wrote, "It's killing me," and Philip responded, "Tell him to hurry."  In the last text Kimberly and Philip received from Fely, she wrote, "Now another hour.  I know I told him."

Defendant argues that some of these text messages were inadmissible under section 1250 because they did not directly declare her state of mind.  Defendant argues that they were offered for their truth, therefore were not admissible under section 1250, subdivision (b).

As to Fely's direct declarations of her state of mind—that she was scared, and nervous—defendant argues that these statements were inadmissible as Fely's state of mind was not at issue.  Thus, defendant argues, they were inadmissible under section 350, which provides that only relevant evidence is admissible.  Defendant asserts that a victim's state of mind is only relevant under two circumstances: first, when the victim's conduct in conformity with that fear is in dispute (*Riccardi, supra*, 54 Cal.4th at p. 816); and second, to prove the defendant's motive when there is independent, admissible evidence that the defendant was aware of the declarant's state of mind before the crime and may have been motivated by it (*id*. at p. 820). Defendant argues that whether or not Fely acted in conformity with her fear is not in dispute, because it is undisputed that Fely served defendant with the divorce papers.  Further, defendant argues, there is no evidence that defendant was aware of Fely's fear of him or was motivated by it.

Defendant cites *People v. Escobar* (2000) 82 Cal.App.4th 1085 (*Escobar*) as an example of a case where the victim's fear

was relevant. In *Escobar*, the trial court admitted statements the victim made to a friend three weeks before her husband killed her: "'. . . I want to get a divorce. I don't want to live with him any longer. But . . . I'm afraid of him because he already told me that if I leave him he is going to kill me.'" (*Id.* at p. 1092.) These statements that the victim feared her husband were relevant to rebut the defendant's testimony that she "fearlessly challenged him . . . , kicked him in the testicles, and insulted him in a very provocative way." (*Id.* at pp. 1092, 1103.) Defendant argues that in contrast to *Escobar*, defendant never stated that Fely hurt him or challenged him, and that her criticism of him never went beyond telling him that he was a bad man. In other words, defendant argues that his description of Fely's conduct immediately preceding the murder was not inconsistent with any fear she may have felt.

As set forth above, defendant put Fely's state of mind at issue in using a heat-of-passion defense. And while defendant did not claim to be provoked by any violence on Fely's part, he did claim that he "los[t] it" and acted "rashly" upon being served with the divorce papers. Defendant recalled begging Fely not to divorce him. And he did not simply recall Fely telling him he was a bad man—he recalled Fely "going on and on about how evil—or how bad I am and how I mistreat—don't treat her right." Defendant's depiction of Fely berating him right after she served him with divorce papers arguably conflicts with her earlier expressions of fear and nervousness regarding the act of serving him. The trial court did not abuse its discretion in allowing the jury to hear this evidence regarding the contested issue of whether defendant acted in the heat of passion.

29

Fely's texts imparting information to Philip and Kimberly about the events on the date of the murder were also admissible to explain Kimberly's and Philip's actions following the murder when they did not hear from Fely. (*People v. Montes* (2014) 58 Cal.4th 809, 863 ["[A]n out-of-court statement can be admitted for the nonhearsay purpose of showing that it imparted certain information to the hearer, and that the hearer, believing such information to be true, acted in conformity with such belief."].) Further, the text messages that narrated the events of the day were admissible under section 1241, which provides that evidence is not made inadmissible by the hearsay rule if it "[i]s offered to explain, qualify, or make understandable conduct of the declarant" and "[w]as made while the declarant was engaged in such conduct."[8] Through the text messages to Kimberly and Philip, Fely narrated her efforts to serve defendant with the divorce papers that morning. The evidence provided a timeline for the murders and confirmed Demirdjian's testimony.

Defendant argues that the statements in which Fely documented her actions on the morning she was killed were inadmissible because they were not relevant. Defendant claims that the process server testified to the events of the morning, and defendant did not contest those facts. Further, defendant argues, Fely's actions were not ambiguous such that explanation by way of the text messages was necessary. However, Fely's text

_____

[8]     The trial court did not admit Fely's text messages on the morning of her killing under section 1241, but the prosecution argued that it was a valid ground for admitting them. We may uphold a trial court's decision if it is correct on any theory, regardless of the rationale stated by the trial court. (*People v. Kerley* (2018) 23 Cal.App.5th 513, 563.)

messages corroborated the process server's recollection of the events of the morning and filled in additional information regarding Fely's actions.

For the reasons set forth above, the trial court did not abuse its discretion in admitting the testimony.

**E.** ***The trial court did not abuse its discretion in failing to exclude the statements under section 352***

Defendant argues that even if the statements were admissible under a hearsay exception or as nonhearsay, they should have been excluded under section 352.[9] Defendant acknowledges that the trial court has "broad discretion" to admit or exclude evidence under section 352. (*People v. Rodrigues, supra*, 8 Cal.4th at p. 1124.) Defendant argues generally that Fely's statements had no relevance to any disputed issue in the case. At the same time, he argues, Fely's statements tended to "'evoke an emotional bias'" against the defendant. (*People v. Wright* (1985) 39 Cal.3d 576, 585.) He claims that the evidence depicted him as a money-fixated individual who disrespected her and treated her "like a piece of shit." In addition, despite a 41-year marriage, he was portrayed as an individual who cheated on her and stayed out late. Defendant argues that this portrait of a greedy, abusive, philandering husband would naturally evoke bias against defendant.

---

[9] Section 352 provides that "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

31

"'Prejudic[ial]' in Evidence Code section 352 does not mean 'damaging' to a party's case, it means evoking an emotional response that has very little to do with the issue on which the evidence is offered." (*Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 597.) In this matter, the nature of the relationship between Fely and defendant, her feelings about defendant, her intention to divorce him, and her communications with the defendant on those topics were relevant to rebut defendant's position that he acted rashly in killing her. They were relevant to show a plan and a motive and to rebut any suggestion that Fely provoked the killing by serving the divorce papers. (*Id.* at p. 595 ["[P]laintiffs were entitled to present evidence tending to establish motive. Without persuasive evidence . . . regarding motive, the jurors might believe there was nothing in the relationship . . . which would precipitate a murder."].) In addition, the text messages on the day of the murder helped to show a timeline of events, to explain Fely's actions, and to explain the concern of her children after they did not hear from her. Given the probative nature of the contested evidence, the trial court's decision to admit it was not beyond the bounds of reason. (See *id.* at p. 596.)

Defendant argues that the prejudicial impact of Fely's 2016 statement that defendant told her "I'll kill you before you take away my Pomona houses" was particularly significant. Defendant argues that whatever probative value it held was diminished due to its remoteness in time from the date of the killing. In addition, it was particularly prejudicial because it allowed the jurors to believe that in 2018, defendant was making good on his earlier threat. Defendant relies on *Armendariz, supra,* 37 Cal.3d 573, as support for this argument. In *Armendariz,* the victim's son testified that, 17 months before the

killing, the victim said he was afraid of the defendant because the defendant had demanded money and threatened to assault the victim if he did not comply. (*Id.* at p. 585.) The trial court admitted the evidence to explain why the victim's son went to the victim's house that night. (*Ibid.*) However, the Supreme Court reversed, explaining that "[t]estimony that a defendant threatened his victim prior to committing the crime charged is a particularly sensitive form of evidence." (*Id.* at p. 589.) The high court concluded that in that case, "it created a substantial danger that despite the limiting instruction, the jury—consciously or otherwise—might consider [the victim's] statement as evidence . . . of the fact that defendant actually threatened to kill [the victim] and inferentially harbored an intent to do so . . . ." (*Ibid.*)

*Armendariz* is distinguishable. First, unlike the present case, the victim's state of mind was not at issue. The killing was said to have taken place during a burglary and robbery. (*Armendariz, supra*, 37 Cal.3d at p. 577.) In addition, the identity of the killer was at issue, as the defendant contended that he went to the victim's house to look for a place to sleep and found the victim's body. (*Ibid.*) Here, in contrast, the issue for the jury was whether defendant acted while under a heat of passion or whether he acted with premeditation. Under the circumstances, the evidence was relevant, and the trial court did not abuse its discretion in determining that it was more probative than prejudicial.[10]

---

[10] Because we have determined that the trial court did not abuse its discretion in admitting any of the contested evidence, we do not address the parties' competing arguments as to whether any such error was harmless.

33

## II. Ineffective assistance of counsel

Defendant argues that trial counsel provided ineffective assistance by failing to object that the admission of Fely's statements violated his federal due process rights. Defendant argues that there was a reasonable probability that the outcome of the trial would have been more favorable to defendant absent the error, therefore the murder conviction should be reversed.

### A. *Applicable legal standards*

To prove ineffective assistance of trial counsel, defendant must make two showings: first, that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and second, that there is a reasonable probability that the outcome would have been more favorable to him absent trial counsel's error. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 694 (*Strickland*); *People v. Hernandez* (2004) 33 Cal.4th 1040, 1052-1053.)

It is presumed that an attorney's performance falls within the wide range of professional competence and that counsel's actions or inactions can be explained as a matter of sound strategy. (*People v. Bell* (2019) 7 Cal.5th 70, 125.) "'If the record "sheds no light on why counsel acted or failed to act in the manner challenged," an appellate claim of ineffective assistance of counsel must be rejected "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation."'" (*Ibid.*)

Defense counsel has a duty to make timely, appropriate objections at trial. (*People v. Daniels* (1991) 52 Cal.3d 815, 891.) A state defendant can allege that the admission of evidence violated his federal due process right to a fair trial. (*Terrovona v. Kincheloe* (9th Cir. 1988) 852 F.2d 424, 428-429.)

**B.** *Counsel did not render ineffective assistance by failing to object to the admission of Fely's statements on constitutional grounds*

Defendant argues that his trial counsel was ineffective because counsel should have objected that the admission of Fely's statements violated not only state law but also the federal constitution. Defendant claims that the admission of Fely's statements rendered the trial fundamentally unfair under the due process clause of the 14th Amendment to the United States Constitution. (*Terrovona v. Kincheloe, supra*, 852 F.2d at pp. 428-429.) The evidence portrayed defendant in a bad light and permitted the inference that defendant premeditated the murder, motivated by financial considerations. Defendant argues that his trial counsel's failure to object on constitutional grounds was either an oversight or ignorance of the law, both of which constitute representation falling below an objective standard of reasonableness. (*In re Wilson* (1992) 3 Cal.4th 945, 955-956 ["Counsel's failure to raise a meritorious objection to incriminating evidence as a result of ignorance or misunderstanding" constitutes ineffective assistance]; see *Hinton v. Alabama* (2014) 571 U.S. 263, 274 ["An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*."].) Defendant argues that there is no conceivable tactical reason for his trial counsel's failure to object that admitting Fely's statements violated defendant's due process rights.

Defendant cites two cases in support of his argument: *People v. Asbury* (1985) 173 Cal.App.3d 362, 365-366, and *People v. Roberts* (2011) 195 Cal.App.4th 1106, 1131. *Asbury* involved

trial counsel's failure to object to certain jury instructions on the ground that they were barred by collateral estoppel. Because such an objection was meritorious, it was "inescapable" that his counsel was ineffective. (*Asbury, supra*, at pp. 365-366). In *Roberts*, the defendant's trial counsel objected to certain statements on the ground of hearsay but not on the ground that such statements were inadmissible because they were not part of the record of conviction of a prior strike. The appellate court could come up with no legitimate tactical reason for trial counsel's failure to make this meritorious objection. (*Roberts, supra*, at pp. 1130-1131.)

Neither case suggests that a due process objection was meritorious under the circumstances of this case or that making such an objection was a crucial step in excluding the evidence. Nothing in the record suggests that the trial was fundamentally unfair due to the trial court's admission of Fely's statements. Thus, defendant has failed to convince us that his trial counsel's actions fell below an objective standard of reasonableness under prevailing professional norms or that there is a reasonable probability that the outcome would have been more favorable to him had his trial counsel made such objections. (*Strickland, supra*, 466 U.S. at pp. 688, 694; *People v. Hernandez, supra*, 33 Cal.4th at pp. 1052-1053.)

As discussed above, the trial court did not abuse its discretion in admitting Fely's statements. When evidence is properly admitted under state law, its admission does not deprive a defendant of due process. (*People v. Merriman* (2014) 60 Cal.4th 1, 67 ["Because the evidence was properly admitted under Evidence Code section 1240, its admission did not deprive defendant of due process."]; see *Riccardi, supra*, 54 Cal.4th at

36

pp. 809-810 [the "routine and proper application of state evidentiary law does not impinge on a defendant's due process"].) Because the statements were properly admitted, defendant was not prejudiced by his counsel's failure to object on due process grounds.

## III. Failure to provide limiting instructions

Defendant argues that the trial court prejudicially erred by failing to grant defendant's counsel's request to give the jury an instruction regarding the limited purpose for which it could consider Fely's statements. Defendant argues that the majority of Fely's statements were merely circumstantial evidence of her state of mind, rather than direct evidence of her state of mind. Thus, defendant argues, the trial court was required to give a limiting instruction upon request. (Citing § 355; *People v. Ortiz* (1995) 38 Cal.App.4th 377, 389.)

### A. *No error in declining to give the limiting instruction as to the 2016 statement*

Defendant only requested a limiting instruction as to one of Fely's statements, specifically, Fely's 2016 statement that defendant said, "I'll kill you before you take away my Pomona houses." At trial, defense counsel argued that the statement was not admitted for its truth, therefore "the limited purpose instruction" would be appropriate. The court inquired of the prosecution regarding a limiting instruction, to which the prosecutor responded, "No. I think it came in to show that that goes toward his motive which would be an intent to kill which would mean the truth of the statement presented." Defense counsel acknowledged the statement was admitted under section 1251 because of Fely's unavailability but stated, "we still have a hearsay issue." The trial court declined to give the limiting

37

instruction, stating, "And that is why I believe . . . defendant's statements that are not written or recorded should be considered with caution.  I think that is sufficient . . . to cover that."  Defense counsel failed to request limiting instructions as to any other of Fely's statements that were admitted at trial.

The discussion at trial regarding defendant's 2016 statement shows that the parties agreed that statement at issue was admitted to show defendant's motive.  As discussed previously, defendant's statement was also admissible pursuant to section 1220 as a statement of a party.  (See *People v. Becerrada* (2017) 2 Cal.5th 1009, 1024 ["no hearsay problem exist[ed]" as to testimony regarding notations written by the defendant because the "defendant was a party, and the testimony was offered against him"].)  Therefore, the trial court did not err in declining to give the limiting instruction as to this statement.[11]

## B.   *Defendant forfeited his claim as to the remainder of Fely's statements*

Defendant acknowledges that his failure to request a limiting instruction as to the remainder of Fely's out of court statements would normally result in forfeiture.  (*Riccardi, supra,* 54 Cal.4th at p. 824 ["Generally speaking, absent a request, the trial court has no duty to give an instruction limiting the purpose

---

[11]   Defendant argues that while the limiting instruction may not have been necessary for defendant's statement to Fely, it was necessary for the passing of the statement from Fely to Kimberly.  Defendant argues that because Fely's statement to Kimberly (relaying defendant's statement) was admissible only for a nonhearsay purpose, the limiting instruction was required.  First, we note that defendant did not make this argument at trial, therefore it is forfeited.  Second, we have already determined that the statement was admissible (see part I.D.1.).

for which evidence may be considered."].) However, defendant argues that under the circumstances of this case, such a request would have been futile. In support of this position, defendant cites *People v. O'Connell* (1995) 39 Cal.App.4th 1182, 1190, where defense counsel's failure to request a certain jury instruction was excused because "[a]ppellant's interpretation of the statute had been categorically rejected by the court on two occasions prior to the time the court and counsel engaged in discussions regarding instructions." (*Ibid.*) Here, in contrast, there is no evidence that the trial court disagreed with the law suggesting that a limiting instruction is appropriate where mental state is evidenced by circumstantial evidence.[12]

Defendant argues that in light of the trial court's ruling as to the 2016 "I'll kill you before you take away my Pomona houses" statement, it would have been futile for counsel to request the limiting instruction as to Fely's other out-of-court statements. We disagree. Defendant's 2016 statement was admitted as a hearsay statement made by the defendant that explained his motive. Many of the other statements were simply evidence of Fely's state of mind and her actions. There is no reason to think

---

[12] Defendant also cites *People v. Brooks, supra*, 3 Cal.5th at page 92 as support for his position that points are preserved for appeal when it would be futile to raise them below. In *Brooks,* the Supreme Court found that the defendant did not forfeit his objection that the trial court erred by inquiring into the numerical breakdown of a deadlocked jury. Due to the longstanding law permitting such inquiry, the trial court "would have been bound to reject any argument that conducting such an inquiry is inherently prejudicial." (*Ibid.*) That is certainly not the case here, where statutory law requires a limiting instruction upon request.

that the trial court would have necessarily reached the same conclusion as to those different statements.

Here, defendant forfeited any claim that the trial court failed to give a limiting instruction as to the remainder of Fely's statements because defendant failed to request such an instruction. The trial court was not expected to give such an instruction sua sponte. (*Riccardi, supra*, 54 Cal.4th at p. 824.)

Although we decline to analyze each statement in detail given defendant's forfeiture, we note that defendant did not suffer any prejudice from his counsel's failure to request, and the trial court's failure to give, the limiting instruction as to Fely's other statements. Unlike the 2016 statement, the remaining statements contained direct expressions of Fely's state of mind, as well as communications between Fely and defendant as to the nature of their relationship and the potential division of their property. None of the remaining statements contained any particularly damaging information if considered for their truth. Instead, the statements were admitted to show that the parties had a difficult relationship and had previously discussed divorce. This is not unusual or shocking communication for a couple leading up to the service of divorce papers. Therefore, even if the trial court had erred, such error would be harmless under the circumstances of this case. (See, e.g., *People v. Nguyen* (2015) 61 Cal.4th 1015, 1042 [trial court's failure to give limiting instruction regarding state-of-mind testimony harmless where "purpose of eliciting [the witness's] statement was clear from the prosecutor's question"].)

**C.** ***Defendant's ineffective assistance claim on this point fails***

Defendant argues that if he forfeited his claim that the trial court erred in failing to give a limiting instruction on all of Fely's statements, then trial counsel was ineffective in failing to request such instruction. Defendant argues that trial counsel has a duty to prepare the case and request all instructions that are necessary. (See, e.g., *In re Cordero* (1988) 46 Cal.3d 161, 189.) Defendant claims that many of Fely's statements were admissible only as circumstantial evidence of her state of mind—thus, counsel should have requested a limiting instruction for all of Fely's statements that did not directly declare a state of mind and not just for the 2016 statement. Defendant further argues that there was no satisfactory tactical reason for counsel's failure to do so. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

As set forth above, the legal standard for showing ineffective assistance of counsel incorporates two elements: that trial counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and that there is a reasonable probability that the outcome would have been more favorable to him absent trial counsel's error. (*Strickland, supra*, 466 U.S. at pp. 688, 694; *People v. Hernandez, supra*, 33 Cal.4th at pp. 1052-1053.) While defendant acknowledges that the record does not reveal why counsel did not request the instruction, he argues that there could be no possible tactical reason for such omission. We disagree. During the discussion of a limiting instruction regarding the 2016 statement, the court noted "if I give the instruction, then I think one of you should talk about what evidence was submitted or presented for a

41

limited purpose." Under the circumstances, "counsel may have deemed it unwise to call further attention" to the statements. (*People v. Hinton* (2006) 37 Cal.4th 839, 878.) Thus, there is a possible tactical reason for counsel's failure to request the limiting instruction.[13]

Further, defendant has failed to show prejudice from any potential failure on the part of his trial counsel. The admitted statements contained direct and indirect expressions of Fely's state of mind, including her fear, her unhappiness, and her desire for a divorce. The prosecution was entitled to show defendant's awareness of Fely's desire for a divorce and the parties' discussion of property allocation. In addition, there is no indication that the prosecution tried to use the statements for any purpose other than to show the timeline of events leading up to Fely's decision to finally attempt to serve defendant. Under the circumstances, defendant has failed to show prejudice, therefore his ineffective assistance claim fails.[14]

---

[13]    We reject defendant's argument that, having concluded that the benefit of the instruction was worth the risk of highlighting the most prejudicial statement—that defendant threatened to kill Fely, counsel had no reasonable tactical basis for not requesting a limiting instruction for the other, less damaging, nonhearsay statements. The opposite could be true as well—counsel felt that the jury would fixate on the threat, and remember it no matter what—therefore the limiting instruction was only worth "highlighting" that very damaging statement and was not worth highlighting the numerous less damaging statements.

[14]    Because we have found no error, we decline to address defendant's argument that cumulative prejudice from the errors violated his Constitutional rights.

## IV.    Presentence custody credits

The parties agree that the trial court erred in denying defendant custody credits.

Defendant was arrested on October 6, 2018, and released on October 8, 2018.  He was rearrested on October 18, 2018, and sentenced on October 1, 2019.  His actual credit consists of 3 days from arrest to release and 349 days from rearrest to sentencing, for a total of 352 days.

The trial court erroneously found that defendant was not entitled to custody credits, apparently relying on the statute that bars those convicted of murder from accruing worktime or conduct credits.  (Pen. Code, § 2933.2, subd. (a).)  Defendant was entitled to credit for all actual days of presentence confinement.  (Pen. Code, § 2900.5, subd. (a) ["In all felony and misdemeanor convictions, either by plea or by verdict, when the defendant has been in custody, including, but not limited to, any time spent in a jail, . . . all days of custody of the defendant . . . shall be credited upon his or her term of imprisonment . . . ."].)

Although trial counsel did not object at trial, defendant did not forfeit the issue.  "The failure to award an adequate amount of credits is a jurisdictional error which may be raised at any time."  (*People v. Acosta* (1996) 48 Cal.App.4th 411, 428, fn. 8; see *People v. Taylor* (2004) 119 Cal.App.4th 628, 647.)  Therefore, the judgment must be modified to award defendant 352 days of presentence actual custody credit.

## DISPOSITION

The judgment is modified to add 352 days of presentence custody credit.  The trial court is directed to prepare an amended abstract of judgment reflecting the modification regarding

presentence custody credit, and to forward a copy of the amended abstract to the Department of Corrections and Rehabilitation.  As so modified, the judgment is affirmed.


_____, J.
CHAVEZ

We concur:


_____, Acting P. J.
ASHMANN-GERST


_____, J.
HOFFSTADT